# EXHIBIT A



STATE OF MICHIGAN

RICK SNYDER
GOVERNOR

DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
MICHIGAN ADMINISTRATIVE HEARING SYSTEM

SHELLY EDGERTON
DIRECTOR

November 16, 2017

Detroit Public Schools Community District    Shanta Driver
3011 W. Grand Blvd., 11th Floor, Suite 1002 Monica Smith
Office of General Counsel                    Driver Schon & Associates PLC
Detroit, MI 48202                            19526 Cranbrook Dr Apt B
Attn: Phyllis Hurks-Hill                     Detroit, MI 48221

Re:  Detroit Public Schools Community District- and- Katrina Brown
     Case No.: C16 J-107   Docket No. 16-030490-MERC

Greetings:

Enclosed is the Decision and Recommended Order by the Administrative Law Judge.
This Decision concludes the handling of this matter by the Administrative Law Judge
and the Michigan Administrative Hearing System. Any further communications
regarding this matter must be addressed to the Michigan Employment Relations
Commission (MERC) at either of the following locations:

*MERC*                          *MERC*
*3026 W. Grand Blvd.*           *611 Ottawa, 2nd FL*
*Suite 2-750*                   *P.O. Box 30015*
*Detroit, MI 48202*            *Lansing, MI 48909*

Telephone 313-456-3510.

## NOTICE OF APPEAL RIGHTS TO THE MICHIGAN EMPLOYMENT RELATIONS COMMISSION

Any party to the proceedings may file written exceptions to this Recommended Order
and a brief in support thereof with the Michigan Employment Relations Commission
(MERC). An original and four copies of the exceptions and brief in support must be filed
with the Commission and a copy served on the opposite party or parties. At the same
time, a statement of service must also be filed with the Commission stating the names
of the parties served, and the date and manner of service of the exceptions on the other
parties. If a party filing exceptions fails to establish that timely service on the opposite
party or parties has been accomplished, the Commission may disregard the exceptions.
Two copies of every exhibit submitted at the hearing by any party must also be filed with
the exceptions.

LARA is an equal opportunity employer
Auxiliary aids, services and other reasonable accommodations are available upon request to individuals with disabilities.
3026 W. Grand Blvd., Ste 2-700, Detroit, Michigan, 48202
www.michigan.gov/lara

*By our calculation the exceptions and brief must be <u>received</u> by MERC by the close of business on December 11, 2017; however, the burden is on the parties to comply with the deadlines in the statute and Commission Rules.* Any questions or disputes regarding the calculation of the deadline for filing exceptions must be addressed to the Commission in writing at the above referenced addresses or at **313-456-3510.**

If no exceptions are received within the above period or within such further period as the Commission may authorize, the Recommended Order will become the Order of the Commission. If exceptions are filed, cross exceptions and/or a brief in support of the Administrative Law Judge's Decision and Recommended Order may be filed by any other party within 10 days of the *date of mailing or* other service of the exceptions.

Please note that this Recommended Order may be edited prior to formal publication. Please notify the Bureau of Employment Relations Secretary at **313-456-2466** of any typographical or other non-substantive errors so that corrections can be made prior to formal publication.

For further information, please consult the General Rules and Regulations of the Employment Relations Commission, R423.101 et seq., available at www.michigan.gov/merc or call the Detroit office of the Bureau of Employment Relations at **313-456-3510**.


Sincerely,

*Maria Ardelean*
Maria Ardelean
Secretary to the Administrative Law Judge



cc: Katrina Brown

TRUE COPY

**STATE OF MICHIGAN**
**MICHIGAN ADMINISTRATIVE HEARING SYSTEM**
**EMPLOYMENT RELATIONS COMMISSION**

In the Matter of:

DETROIT PUBLIC SCHOOLS COMMUNITY DISTRICT,
    Public Employer-Respondent,

                                           Case No. C16 J-107
    -and-                               Docket No. 16-030490-MERC

KATRINA BROWN,
    An Individual-Charging Party.

                                                         /

APPEARANCES:

Rebecca Shaw Hicks, Assistant General Counsel, for Respondent

Driver, Schon and Associates, P.L.C., by Shanta Driver and Monica Smith, for Charging Party

**DECISION AND RECOMMENDED ORDER**
**OF**
**ADMINISTRATIVE LAW JUDGE**

    Pursuant to Sections 10 and 16 of the Public Employment Relations Act (PERA), 1965 PA 379, as amended, MCL 423.210 and 423.216, this case was heard on five dates between February 14 and April 4, 2017, before Administrative Law Judge Julia C. Stern of the Michigan Administrative Hearing System (MAHS) for the Michigan Employment Relations Commission (the Commission). Based upon the entire record, including a timely post-hearing brief filed by Respondent on May 23, 2017, and a post-hearing brief filed by Brown on June 1, 2017, I make the following findings of fact, conclusions of law, and recommended order.[1]

The Unfair Labor Practice Charge:

    On October 28, 2016, Katrina Brown filed this unfair labor practice charge against her employer, the Detroit Public Schools Community District, alleging violations of Section 10(1)(a), (b) and (c) of PERA. Until October 2016, when she was transferred to a different school, Brown was employed first as a sixth grade teacher and then, briefly, as a fourth grade teacher at John R. King Elementary/Middle School (J.R. King).

---

[1] Brown's counsel asked for, and was granted, an extension to May 23, 2017, to file her brief because of the illness and hospitalization of Co-Counsel Smith, whose task it was to prepare the brief. Brown did not request a second extension, but the brief was not filed until June 1, 2017. The brief was accompanied by an explanation by Smith of her illness. Because of this explanation, and because I found Brown's brief essential to clarify her allegations in this complicated case, I have made it part of the record.

1

During the 2015-2016 school year Brown was an alternate building representative for the bargaining representative of Respondent's teachers, the Detroit Federation of Teachers (DFT or the Union), and in the spring of 2016 she was elected building representative for the following school year.  In March or early April 2016, Brown and another teacher met with J.R. King Principal Felicia Cook to complain about an email Cook had sent to staff and to discuss other staff concerns.

In April 2016, after Respondent had tested the water in all of its school buildings, it discovered that two drinking fountains and a kitchen sink at J.R. King had unacceptably high levels of copper. The water to all the building's drinking fountains was then turned off. In May and June 2016, Brown complained to Cook and to the Michigan Occupational and Safety Administration (MIOSHA), about inadequate supplies of drinking water at the school.  She also filed a complaint with the U.S. Department of Labor alleging that Cook had retaliated against her for her complaints.  In September 2016, when the water at J.R. King was mistakenly turned back on, Brown contacted the Detroit Health Department and complained to the Michigan Department of Environmental Quality (MDEQ). On or about September 16, 2016, the water fountains were again turned off. However, Brown continued to raise concerns with other teachers and administrators about the effect of the water on staff and students. This included urging that Respondent provide testing for staff members for abnormal copper levels and that Respondent notify J. R. King parents that they should have their children tested for abnormal copper levels.

Brown alleges that Respondent, including but not limited to Cook as its agent, unlawfully discriminated against her for her union and other concerted protected activities in violation of Section 10(1)(a) and (c) of PERA. The acts alleged to violate Section 10(1)(a) and (c) are: (1) on May 27, 2016, giving Brown a minimally effective rating on her year-end evaluation and then intentionally ignoring or misplacing Brown's attempts to appeal the evaluation; (2) sometime in the summer of 2016, reassigning Brown to teach the fourth grade, allegedly to make it more likely she would be transferred  in the "leveling process," if J.R. King lost positions in the fall of 2016; and (3) on September 23, 2016, involuntarily transferring Brown from J.R. King to Ronald Brown Academy.

Brown also alleges that Cook and J.R. King Vice Principal Ivan Branson unlawfully interfered with her and other employees' exercise of their Section 9 rights by: (1) in May 2016, refusing to investigate Brown's complaints about the conduct of several eighth grade teachers toward her during a school basketball game; (2) in late May 2016, seeking to transfer Brown to another school; (3) on June 7, 2016, sending Brown an email telling her she was fired; (4) on or about June 22, 2016, sending a school volunteer, Carl Shazor, to Brown's classroom to question Brown in an intimidating fashion about a leaflet addressing water issues that had been passed out outside the school; (3) on August 31, 2016,  issuing a written warning to Brown for a remark she made to Cook during a meeting held in Branson's office to question Brown about whether she had been elected building representative in a proper election; (4) announcing, at a staff meeting held on September 19, 2016, that teachers were to raise any concerns they had about the water  at J.R. King with Cook and were not to take these concerns to individuals outside the school or to outside agencies; (4) failing to take action against another teacher who remarked, after Cook made this announcement, "Snitches get stiches."

2

In addition, Brown alleges that Respondent, through its agents Cook and J.R. King Vice-Principal Ivan Branson, unlawfully interfered with the administration of the DFT in violation of Section 10(1)(b) of PERA by: (1) on or about August 31, 2016, questioning Brown's statement that she had been elected building representative and convening a meeting of past and present building representatives to investigate whether Brown had been properly elected and whether, as such, she was entitled to an extra preparation period; (2) requiring Brown to prove at that meeting that a building representative election had occurred and that she had been elected; and (3) in the fall of 2016, questioning teachers at J.R. King about whether they had voted in an election for building representative the previous spring.

In October 2016, after Brown's involuntary transfer, she went on a voluntary extended unpaid medical leave. Brown asserts that Respondent's actions, as outlined above, made it untenable for her to continue to work and that had she done so her health would have been seriously affected. Brown argues, therefore, that Respondent's actions amounted to a constructive suspension. She asserts that, in addition to an order requiring Respondent to return her to work at J.R. King and to cease and desist from its other unlawful conduct, the Commission should order Respondent to make her whole for all wages and benefits lost while she was on medical leave.

Findings of Fact:

### Notes on Credibility

This case is unusual not only because of the unusually large number of witnesses, twenty-two, but because of the number of instances where witnesses provided materially different versions of the same events.  The two most important witnesses in this case were Brown and Cook.  Neither Brown nor Cook impressed me as entirely credible witnesses. For example, as discussed below, at the hearing Brown testified that Georgina Tait, the principal at Ronald Brown Academy and a stranger to Brown before she reported to work there, told Brown that Tait knew Brown was a "complainer." Brown also testified that Tait threatened her with discipline if she continued to complain. Tait, however, explicitly denied making either of these statements and also testified in detail about her brief conversations with Brown. In her detailed charge, however, Brown made no mention of this seemingly significant conversation, a fact that strongly suggests to me that Brown was willing to lie on the stand to bolster her case.  Cook was also a poor witness. Cook sat with Respondent's counsel throughout the hearing and heard all the testimony before she testified as Respondent's last witness. Despite this, Cook claimed that she was unable to recall many of the events which were set out in the charge and about which multiple witnesses had already testified. Cook also claimed to be unable to recall several emails apparently sent from her school email account and, incredibly, claimed to be unable to remember whether she gave any teacher at J. R. King other than Brown a less than "effective" rating on their 2015-2106 year-end-evaluation. Because I found neither Brown nor Cook to be fully believable, I have relied as much as possible on the supporting testimony of other witnesses, as discussed below.

3

## Background

J.R. King is a kindergarten through eighth grade (K-8) school. During the time period covered by the charge, J.R. King was considered a "priority" school, i.e., one of the schools where students' test scores had been among the lowest in the state for several years. For that reason, as the staff was fully aware, J.R. King was at risk of being closed if its test scores did not improve.

Katrina Brown was first employed by Respondent in about 2002. Prior to coming to J.R. King, she taught ninth grade science and special education at several Respondent high schools. She began teaching sixth grade at J.R. King in about 2012. The sixth grade teachers at J.R. King normally "platoon," i.e. each sixth grade teacher teaches a particular subject or subjects to all the sixth graders. Until the spring of 2016, Brown had a sixth grade home room and taught science to all sixth graders; one year, she also taught social studies to the sixth grade.

In the spring of 2014, Stacye Dowlen, an eighth grade teacher, was elected DFT building representative for J.R. King for the 2014-2015 school year. Brown was elected alternate building representative in the same election. During the 2014-2015 school year, Felicia Cook became principal at J.R. King. Cook had not previously been assigned to this school.

Near the end of each school year, Respondent's principals prepare written year-end performance evaluations for each teacher under their supervision. Teachers are given a separate numerical rating for each category included on the evaluation form, including whether their students have demonstrated academic growth during the year. Teachers can view their evaluations electronically after the principals complete their portion of the evaluation, which includes an initial weighted total score. The evaluations are then forwarded to Respondent's Office of Research, Evaluation and Assessment. This office adds points, up to a maximum, based on the teacher's attendance record and whether the teacher has any written reprimands or suspensions on his or her record. Sometime in July, Respondent's Human Resources Department sends each teacher a letter formally notifying them of their initial evaluation score, the points they have received for attendance and discipline, and their final score. They are also told whether, based on their final score, they have been rated "highly effective," "effective," "minimally effective" or "ineffective." [2]

These ratings are reported to the Michigan Department of Education (MDE). By statute, a teacher who receives an "ineffective" rating has the right to appeal his or her evaluation to the district superintendent. MCL 380.1249(2)(l). A school district is not required to review the evaluations of teachers rated "minimally effective." See "Educator Evaluations Frequently Asked Questions," p 15, at www.michigan.gov/documents/mde/Educator_Evaluations. However, a school district may allow a teacher to appeal a rating other than "ineffective." According to Cassandra Washington, Respondent's Executive Director of Human Resources, it is the school district's policy that any Respondent teacher can request review of his or her evaluation by filling out a "survey" on Respondent's website.

---

[2] These categories are mandated by statute. See MCL 380.1249(1)(c)

4

According to Washington, a link contained in the letter teachers receive notifying them of their rating allows teachers to make comments or inquiries on the website regarding any of the components of their performance evaluations. Washington testified that comments made on the website are reviewed by Human Resources, and, if appropriate, referred to the department that manages academics and curriculum. If changes are made to a teacher's rating with the MDE, the teacher is informed of that fact. Cassandra Washington testified that Respondent's policy was to direct any teacher who attempted to appeal an evaluation by letter to the website. Washington did not say, and was not asked, how or if Human Resources staff was directed to respond to email appeals.

The letter Respondent sends to teachers informing of their final evaluation score includes this paragraph:

> Should you have questions related to the Teacher Performance Evaluation System, please refer to the frequently asked questions (FAQ) on the District's HUB via the Human Resources link https://hub.detroit12.org/departments/human-resources/all.

In the spring of 2015, Cook gave Brown a year-end evaluation that rated her "effective" in all categories except "maintains accurate grade books, lesson plans and student records," and "uses a variety of techniques for communicating progress." Cook rated Brown "minimally effective" in both these categories. On July 29, 2015, Brown received a letter from Respondent stating that her composite score for the evaluation was 78.2 and that her final overall rating was "minimally effective." However, two days later, on July 31, 2015, Brown received a second letter from Respondent stating that her performance evaluation score had been inaccurately reported and that her true composite score on the 2014-2015 evaluation was 91, or "highly effective." Brown's 2013-2014 evaluation was not admitted as an exhibit, but Brown testified without contradiction that she was rated "highly effective" for that school year.

### The 2015-2016 School Year

In the fall of 2015, there were three sixth grade teachers at J.R. King: Brown, Tiffany Jackson, and Glenda Booker. Booker held a position on the DFT executive board. The three sixth grade teachers "platooned," with Brown teaching science to all the sixth graders. Sometime around October 2015, Brown and Jackson began quarreling over classroom management and other issues. Cook and Branson held several meetings with all three sixth grade teachers in an attempt to mediate, but disputes continued to arise. According to Brown, at one point Cook told the sixth grade teachers that "she was not going to deal with the sixth grade team anymore," and instructed them to see the school secretary for anything they needed. Cook also talked to Lauri Washington, whose title is deputy executive director for labor relations, about whether discipline should be issued.[3] Lauri Washington recommended that Brown be given a "write-up," but Cook decided not to take that route.

---

[3] Lauri Washington's duties in that position include providing advice on teacher disciplinary issues.

5

During the first semester of the 2015-2016 school year, J.R. King teachers came to Brown, as alternate building representative, with complaints about class size, the cleanliness of the building, and student discipline. There is no indication, however, that Brown brought these complaints to the attention of administration or that she filed any grievances.

On February 7, 2016, Cook sent an email to all J.R. King teachers urging them to think and speak positively about the school's students and their abilities. She also urged them to "roll up their sleeves" and give their all to the school. In this email, Cook accused the teachers of "committing educational malpractice" if they "chose not to assist."

Some teachers, including Brown, took offense at the implication that they were guilty of educational malpractice, and Brown asked to meet with Cook. Sometime in March or early April, Brown, Booker and Cook met and discussed the February email. They also discussed fund raising at the school; the eighth and seventh grade students were authorized to sell snack foods to other students as class fund raising projects, and Brown was concerned that the money collected was not being properly accounted for.

Around the same time, Cook decided that because of the continuing quarrels between Brown and Jackson, the sixth grades should become self-contained, with each sixth grade teacher teaching all subjects to the students in her homeroom. Shortly after this arrangement was implemented, Jackson went on an extended medical leave. Respondent's Human Resources Department decides whether to allow teachers to go on medical leave, and principals are not involved in the process or necessarily informed of the reason for the leave. According to Vice-Principal Branson, Jackson left to have surgery. However, Cook testified that she believed that Jackson's medical leave was prompted by stress over her disputes with Brown. The students in Jackson's home room were to be taught by a substitute teacher for the remainder of the school year. However, Respondent had difficulty finding a regular substitute. Because there was often no substitute available, during the remainder of the 2015-2016 school year Jackson's students were frequently split, with half assigned to Booker's classroom and the other half to Brown's classroom for a day or more. The absence of consistent supervision caused discipline among Jackson's students to deteriorate and made classroom management more difficult for Brown and Booker on days when Jackson's students were in their classrooms.

Sometime in April 2016, J.R. King began administering standardized Measurement of Academic Progress (MAP) tests to its students. MAP tests, which are administered several times per year including the fall and the spring, are designed to assess whether a teacher's students have made progress in the subjects tested during the course of a school year. Instructional specialists at the school were responsible for scheduling times for teachers to take their students to the computer labs to complete the MAP tests. There is no dispute that in 2016, the students in Brown's class were not tested during the regular spring testing period. However, at the hearing, Brown and Sabrina McConnell, the instructional specialist assigned to grades six through eight, each blamed the other for the fact that the students were not tested on schedule. Brown also maintained that her students were not tested at all, while McConnell testified that she obtained permission to test them after the regular testing period and that she supervised the testing herself.

6

On April 27, 2016, a staff meeting was held which began with McConnell and the school's other instructional specialist, Nicole Samuel, talking about the MAP testing and scores. McConnell, Samuel and Brown all had different versions of what took place during that meeting. According to Brown, she raised her hand to say that her students had never been tested, repeatedly said, "Excuse me, I have my hand raised," but was never allowed to speak. McConnell's testimony was that when she and Samuel asked teachers if they needed any help with the testing, Brown said that she was not receiving any help. According to McConnell, despite McConnell's and Samuel's assurances that they would help her, Brown remained agitated and continued to speak while McConnell and Samuel tried to answer questions from other teachers. Samuel testified that Brown asked Samuel and McConnell who was supposed to test the sixth grade students. According to Samuel, when she told Brown that it was the teachers' responsibility, Brown said that it wasn't her job, and that the instructional specialists should test the students since they did not do anything else. The witnesses agree that after McConnell and Samuel completed their portion of the meeting, they sat in the audience and Cook proceeded with the agenda. Samuel testified that she sat down near Brown in the back of the room and heard Brown say again that the instructional specialists should be doing the testing. According to Samuel, she turned around and asked Brown if Brown was talking to her, and Brown said, "Yeah, I'm talking to you, now what?" Yancy Gideon, another teacher, confirmed Samuel's version of the exchange and added that Brown glared at Samuel while she was speaking. According to Cook, she observed Brown interrupting Samuel and McConnell. However, she did not indicate whether she heard anything the three women said. Cook also testified that after she began her portion of the meeting, she was interrupted by a commotion in the back of the room. Cook testified that she could not hear what was said, but that she could tell by Samuel's and Brown's body language that this was not a professional exchange.

As discussed more fully below, Brown was later reprimanded by Cook in a memo dated May 20, 2016, for refusing to be quiet during Samuel's and McConnell's portion of the meeting and for allegedly acting in a hostile fashion toward them. Brown admitted that she repeatedly waived her hand and that she spoke out during the meeting when Samuel and McConnell failed to call on her. Clearly, Brown's behavior, as she herself described it, could have been considered rude. I find it unnecessary to resolve the question of whether Brown said anything else to McConnell or Samuel during this meeting or what they may have said to her, since Cook did not testify to hearing any of their exchanges and did not mention it in her May 20 memo.

Dowlen decided not to run for DFT building representative for the 2016-2017 school year, but did not make arrangements in the spring for an election to be held to replace him. At the beginning of May 2016, Booker learned at a DFT executive board meeting that there had been no building representative election at J.R. King, and Booker hurriedly arranged one. Per the normal process, teachers were asked to nominate candidates for building representative, alternate, and membership on the school union committee. The nomination forms were distributed to teachers by the current union committee. The nominees were then asked if they would accept the nomination, and the names of the candidates were posted on the bulletin board in the teachers' lounge. Booker handled these two steps herself. Six teachers were nominated for building representative but only one, Brown, accepted the nomination. Lakina Mosely was the only teacher who accepted nomination for alternate. Seven teachers accepted nominations for the seven slots on the building committee.

After the nominations had been posted for a week, ballots were distributed to teachers, even though none of the positions were contested. On or about May 20, 2016, Booker posted the names of the new union representatives, including Brown as the new building representative, on the bulletin board in the lounge.

<u>Drinking Fountains Are Shut Off at J.R. King</u>

Sometime in late 2015 or early 2016, Respondent began testing the water in all its buildings for contaminants. On April 13, 2016, Respondent announced that nineteen schools had excessive levels of copper and/or lead in their drinking water. J.R. King was identified as having unacceptable levels of copper in the water from a sink in the kitchen and several drinking fountains. On April 14, 2016, Cook sent a memo to J.R. King parents and staff indicating that the water to that sink and all drinking fountains in the school would be shut off until further notice. Cook's memo stated that Respondent would be providing bottled water to the students and staff. The affected sink and the school's drinking fountains were then shut off and the drinking fountains were wrapped in plastic. The water to all of the school's other sinks, including the sinks in the restrooms, remained on, but signs were placed on the restroom sinks telling people not to drink from them. Cook testified that many teachers came to her after this happened to ask questions about why the water fountains had been turned off.

At J.R. King, and perhaps other Respondent schools, the decision was made to distribute water to students in four ounce cups. According to Booker, boxes containing ninety-six four ounce cups of water were delivered to each classroom each day; Brown remembered the number of cups as being about sixty. At J.R. King, both students and staff were also initially allowed to bring their own water. However, having students with water bottles in class proved disruptive, and after a short period students were barred from bringing them to school; staff continued to be allowed to bring water bottles. There was a conflict in testimony, which I find unnecessary to resolve, over whether teachers, if they requested it, could ask for and get additional boxes of water. In any case, however, Brown testified that some of the bigger boys in her class wanted to drink three or four of the small cups at a time. She also testified that certain teachers other than herself, including a first grade teacher, felt that the supply of water was insufficient.

On April 28, 2016, Brown emailed Network Leader Sherrell Hobbs, Cook's immediate supervisor, asking for an emergency meeting.[4] On May 4, 2016, Brown and Hobbs spoke and, as confirmed in an email from Hobbs on May 6, Hobbs told Brown that she should put her concerns in writing to Cook. There is nothing in the record about what Brown discussed with Hobbs on May 4 and her email did not explain the purpose of the emergency meeting. Hobbs said that if Brown was not satisfied with Cook's response she should request a meeting and Hobbs would attend as a neutral party. Cook was not copied on this correspondence.

On May 20, 2016, Cook gave Brown a written memo stating that Brown was guilty of "unprofessionalism resulting in insubordination," citing Brown's conduct at the April 27, 2016, meeting discussed above.

---

[4] Respondent's schools are grouped into "networks" for administrative purposes. The grouping is not geographical. In April 2016, J.R. King was in Network One and in the summer of 2016 was transferred to Network Two.

8

According to the memo, Brown refused to be quiet while the instructional specialists were speaking and showed hostility toward them. The memo also cited two other incidents, both occurring on May 4. One involved a conversation between instructional specialist Samuel and Brown in the hallway which Brown allegedly tried to record on her phone; the other involved a separate conversation during which Brown allegedly used profanity toward instructional specialist McConnell.[5]  Cook admitted that she did not interview Brown to get her version of the May 4 incidents before writing the memo. Because Cook considered all these incidents to be examples of "bullying," she sent the memo to Respondent's Risk Management Office as a bullying incident report, rather than to the Human Resources Department to be placed in Brown's personnel file as discipline.

As May 2016 progressed, temperatures increased both outside and in the classrooms at J.R. King. Brown felt that her students were dehydrated in their hot classroom. Brown testified that she also talked to other teachers who also felt that their students were not getting enough water. On or about May 23, 2016, Brown spoke to Cook and requested that more water be supplied. According to Brown, Cook told her to put her request in an email. Cook did not recall Brown making this request, but I credit Brown.

On about May 25, Brown was involved in an altercation with several other teachers at an after-school basketball game. The game was a fund-raiser in which the seventh graders played the eighth graders in front of paying spectators. According to the testimony of Marvin McCallum, a teacher who was supervising the game, students from other grades were allowed to attend the game if they paid and if there were enough teachers to supervise them.  McCallum testified that before the game began, a group of sixth grade students unaccompanied by a teacher tried to push their way into the gym. McCallum turned them away because of their rowdy behavior.  Shortly thereafter, Brown came to the door of the gym with sixth graders from her class and Booker's. It is not clear whether these were the same sixth graders that McCallum had previously turned away for being too rowdy. McCallum refused to let Brown and the students into the gym. Brown then led the students to a door on the opposite side of the gym, and let them in.  An argument then broke out on the gym floor that involved Brown, McCallum, Dowlen, who was also supervising the game, and another teacher who was selling tickets. Angry words, including profanity, were exchanged in front of students, some of whom joined in the argument. McCallum testified that Brown shoved him, and another witness testified that Dowlen had to be restrained from striking Brown. Both Brown and McCallum complained to Cook about the other's conduct during the incident, but there is no indication that Cook interviewed any of the participants or conducted any investigation. Cook did not take any disciplinary action against any of the teachers involved.

On the morning of May 26, 2016, Brown and Glenda Booker met with Cook, at Brown's request. Brown told Cook that her students were overheated and dehydrated, and requested that the school provide bottles of water and fans for the classrooms. Cook testified that she did not recall Brown making this request, but both Brown and Booker testified about the meeting and I credit their testimony.

---

[5] According to McConnell, when she came to Brown's classroom to talk about Brown's testing schedule, Brown said, "Get your ass away from my door."

Brown also complained about the fact that she and Booker were constantly forced to teach Jackson's students along with their own; Brown said that their classrooms were overcrowded as well as hot. What else was said in this meeting is not clear. In a later email to Hobbs, Brown said that she had informed Cook in this meeting "about the illegal, unethical, unsafe, hostile work environment and hazardous activities" going on at the school.

On May 27, Cook sent Brown an email telling Brown to talk to the school kitchen about the water situation. Cook also emailed Brown that the school had no fans.

<u>Brown Is Offered a Transfer</u>

Cook testified that in early May 2016, she was standing outside the school building supervising student release at the end of the day when Brown came up to her and said that she wanted to transfer to another school. Stacye Dowlen, the eighth grade teacher mentioned above, testified that he was standing next to Cook at the time and that Brown said, "I have my transfer, will you sign it?" Both Cook and Dowlen testified that Cook then turned to Dowlen and said, "Did you hear that?" Dowlen said that he had. According to Cook, shortly thereafter she telephoned Brown, told her that Erika McClure, whose title at that time was deputy network leader, could help with a transfer, and gave Brown McClure's telephone number. Brown denied that either of these conversations took place or that she ever asked to be transferred from J.R. King.

On the afternoon of May 26, after Cook had met with Brown and Booker, Cook telephoned Brown in her classroom and told her that McClure would be calling her about a transfer to another school. Later that day, McClure called Brown and told her that McClure had a possible new school for her to go to and to be ready to start at the new school the following Monday.

Although Respondent has full authority under the collective bargaining agreement, as well as the law, to make transfer decisions, McClure testified that, in general, Respondent transfers teachers between schools only during designated transfer periods. Article 15 of the collective bargaining agreement provides that teachers may request a voluntary transfer between April 1 and July 15 for a transfer effective the following school year. However, according to McClure, because Respondent had so many teacher vacancies in May 2016, it was possible for a teacher who was not happy for any reason and wanted a transfer to get an immediate transfer to another school within the network at any time if the principals of the teacher's old and new schools agreed. McClure also testified that while teachers requesting a voluntary transfer during the open period had to submit their requests in writing, transfer requests at other times were handled more informally.[6]

McClure testified that in April or May 2016, Cook emailed McClure and told her that she had a teacher who was interested in transferring schools. McClure then phoned Brown to tell her that McClure had a possible new school for her to transfer to. Although McClure did not remember the date of her call, this was the first contact she had with Brown about a transfer.

---

[6] No written request by Brown to transfer was entered into the record.

McClure and Brown agree that when McClure told Brown about the transfer, Brown immediately asked McClure if Cook was trying to get her transferred. According to Brown, McClure told her that she (McClure) had received an email from Cook about a transfer for Brown, and that there was an opening at another school if she wanted to go. According to Brown, she then asked McClure why she was being transferred since she had not asked for a transfer, and McClure said that she did not know and would check and get back to her. According to McClure, after Brown asked if Cook was trying to transfer her, McClure explained to Brown that she would only be transferred if she agreed. McClure testified that Brown then asked her what transfer options were available, and McClure said that she would call Brown back. McClure and Brown agree that they had a second phone conversation. According to Brown, when McClure called the second time she told Brown that the transfer was not going to go through because the other teacher did not want to come to J.R. King and because the transfer was involuntary. According to McClure, when she called Brown the second time, Brown said that she was not interested in transferring so late in the year.

I found McClure to be a disinterested and credible witness. I accept her testimony that Cook contacted her and told her that she had a teacher (Brown) who was interested in transferring schools, and that this is why McClure phoned Brown and offered her a transfer. However, I do not credit Cook's testimony, or Dowlen's, that sometime in early May, Brown came to Cook and told her that Brown wanted to transfer schools. I did not find Dowlen to be a credible witness. Between early May 2016 and the date of his testimony, Dowlen had at least two hostile encounters with Brown, the argument in the gym described above and another argument at the end of August 2016. Moreover, while on the stand Dowlen refused to look at Brown or her counsel and seemed to be struggling to suppress his anger. More importantly, however, both Brown and McClure agree that Brown's first reaction to McClure's phone call telling her that McClure had found a school for her to transfer to was to ask if Cook was trying to get her transferred. I do not believe that Brown would have reacted this way if she had in fact told Cook weeks before that she wanted to transfer. In sum, I conclude that while Cook did call McClure and told her that Brown wanted to transfer, perhaps in the hope that if Brown was actually offered a transfer she would take it, Brown did not request to be transferred.

<u>Brown's 2015-2016 Year-End Evaluation</u>

On May 27, 2016, Brown received an alert that her year-end evaluation for the 2015-2016 school year had been posted to the computer system. Brown's score on the performance component of the evaluation, i.e., the portion completed by Cook, was 53.2. When points were added for the fact that Brown had no suspensions or written reprimands on her record and no unexcused absences, her total final score was 78.2, which put her in the "minimally effective" category. [7]

Teachers at J.R. King are required to keep binders detailing work that they have done over the year. At the beginning of the year, Cook provides teachers with a rubric explaining what should be in the binder.

---

[7] As noted above, Cook did not send the May 20, 2016 memo she wrote regarding Brown's behavior at the professional development meeting to Human Resources as discipline. Moreover, it is unclear whether if she had the memo would have qualified as a "reprimand" under Respondent's policies.

This includes the results of required standardized assessment tests and any other student assessments administered by the teacher during the school year; lesson plans through the year; and anything related to discipline. Before she completes the teacher's year-end evaluation, Cook meets with each individual teacher and they go over the teacher's binder together. The teacher then leaves the binder with Cook so she can review it. It is also Cook's practice to have each teacher, including those previously rated as effective, observed in the classroom by the principal and/or vice-principal at least twice during the year and to have written reports prepared after these evaluations.[8] The reports are stored electronically and teachers can view their own observation reports by accessing the system.

According to Brown, in May 2016 she signed up for her meeting with Cook to discuss her binder but was informed by the school secretary that she would have to reschedule. Brown testified that the meeting was rescheduled for May 13, 2016, that she met that day with Cook, and that they went over her binder. According to Cook, however, Brown never gave Cook her binder and she and Brown never discussed it. According to Cook, Brown showed up for her first meeting without her binder, and Cook told Brenda Jordan, the school secretary, to reschedule Brown's meeting. Jordan who testified at the hearing, explained that teachers came to her to schedule their meetings with Cook. Jordan kept a list of meeting dates and times with the teachers' names written in. After Cook met with a teacher, Jordan asked Cook if another meeting was needed. If Cook said it wasn't, Jordan wrote, "OK," next to the teacher's name on her list and crossed the name out. If a teacher hadn't come in for the meeting or had not brought everything he or she needed to the meeting, Jordan made a notation on her list and called the teacher and asked them to reschedule. Jordan recalled telephoning Brown to reschedule her meeting. However, Jordan testified that she also remembered Brown stopping by her desk later and saying that she had turned in everything she needed to and that "it was done," or something to that effect. Both Jordan and Cook testified that after Jordan reported this to Cook, Cook said to Jordan, "Is that what she said?" Cook also asked Jordan to write down what Brown had told her and sign it.

Copies of Jordan's lists for May 11 and May 13, 2016, were admitted into the record. On May 11, Jordan wrote "reschedule for Thursday, May 12, after or morning" next to Brown's name in the 3:30 to 4:30 pm time slot. Jordan wrote on the top of the sheet for May 13, "K. Brown – after clear for the morning," which according to Jordan meant that Brown said that she could come in that day after the morning. However, although several time slots on Jordan's May 13 list have names next to them, Brown's name is not on that list.

I find this incident very puzzling. Brown seems to have understood the importance of the information in her binder, and surely would have known that failing to submit her binder would affect her evaluation score. However, although Jordan admitted that she did not recall many specifics about the interviews she scheduled for Cook the previous year, Jordan testified that she did remember Brown stopping by her desk and telling her that she did not need to meet with Cook, as well as her later conversation with Cook about this. Jordan struck me as a credible witness, and this event would have been unusual enough to stick in her memory.

---

[8] There is no statutorily required minimum number of evaluations for a teacher who has been rated effective or highly effective on his or her two most recent annual evaluations. See "Michigan Educator Evaluations Frequently Asked Questions," supra, at 8.

There is also the fact that while Brown testified that she met with Cook on May 13, her name was not on Jordan's schedule for that day. I credit Cook's and Jordan's testimony regarding this incident.

Respondent's teacher evaluation form has eight "core elements" and a total of fourteen separate rating categories. In her 2015-2016 evaluation, Cook rated Brown "minimally effective" in all but three categories. She was rated "effective" in "uses a variety of techniques to communicate progress in a timely manner," and "managing student behavior," and "ineffective" in "significant relevant accomplishments and contributions." In all of the categories in which Cook rated Brown "minimally effective, " Cook included the statement "did not show evidence," or "need to show evidence," and for seven of the eleven this was the only comment Cook made. Although the evaluation form had spaces for the evaluator to make recommendations for improvement in each category, Cook did not write anything in these spaces. In the category "demonstrating student growth" Cook wrote, "there was less than 50% student growth… 33% on MAP scores for science. Did not present data to show growth for ILC." [9]

At the hearing, Cook explained that on the MAP test given in the fall of 2015, 50% of the sixth grade students tested had met their "RIT scores," whereas in the spring only 33% had. [10]Cook testified that her rating of Brown in the category of "demonstrating student growth," was based strictly on the progress in science, as demonstrated by the MAP test, of all the sixth graders who took the test. Cook admitted that there might have been sixth grade students who did not take the MAP science test in the spring of 2016 or whose scores had not yet been recorded in the system when Cook prepared Brown's evaluation. However, Cook testified that there are ways other than MAP scores for teachers to demonstrate their students' progress, including ILCs. According to Cook, some teachers also include student report cards in their binders to show student progress. Cook testified that since Brown did not submit her binder, and the MAP scores did not show progress, Cook had no evidence to demonstrate that Brown's students had progressed.

Cook admitted that no written observation reports were prepared for Brown during the 2015-2016 school year, although Cook testified that she did visit Brown's classroom several times. Branson testified that he tried to observe Brown four times during the school year, but each time Brown said that she was not ready so he did not observe her; Brown did not explicitly deny that these conversations took place.

After seeing her evaluation in the computer system at the end of May, Brown contacted Hobbs. Hobbes told her that she could talk to Cook or wait until she received formal notification of the evaluation and appeal it. On June 28, 2016, Brown sent an email to Hobbs and Lauri Washington asking to file an appeal of her evaluation. In this email, Brown stated that she received a low evaluation score from Cook after they had "met about students not receiving water, hostile work environment, fraud, etc." In this email, Brown noted that she had not received any written observation reports before her "summative end-of-year conference," and

---

[9] Instructional Learning Assessment.

[10] There was no explanation in the record of this acronym, but it may stand for "Rausch Unit," another way of measuring student growth.

13

asked if she should have received her rating score ten days after her meeting with Cook. Brown did not receive a response to this email from either Hobbs or Lauri Washington.

On July 29, 2016, Brown was sent a letter from the Human Resources Department notifying her of her final evaluation score and her "minimally effective" rating. At the bottom of this letter was the paragraph quoted in the "Background" section above that referred Brown, if she had questions about the evaluation system, to the FAQ section of a website. On September 15, 2016, Brown sent another email, labeled "second request for a review/hearing" of her final performance evaluation, this time to Executive Director of Human Resources Cassandra Washington and Human Resources Department Director James Baker. In this email Brown stated that "the score I received was inaccurate, intentional and it holds no merits. [sic]" Brown did not receive a response from either Cassandra Washington or Baker to this email. There is no evidence that Brown sent a letter by mail to the Human Resources Department asking to appeal her evaluation. However, the record includes a hand-written document time-stamped by the Human Resources Department on December 7, 2016, and addressed to Baker. According to Brown, on that date she came to the Department's offices without an appointment in an attempt to speak to Baker, and ended up leaving the document there. In this document, Brown again asserted that her end of year evaluation was unjust and unfair and requested a hearing.

Brown testified:

> They give you 30 days to appeal it. I sent – did the appeal process, and I also sent it to the State. I requested it like eight or nine times, the appeal process with James Baker and with the State of Michigan. I wanted it appealed because I felt that it was inaccurate and it was unfair, unfair and unjust. [11]

Washington testified that at the end of December 2016 she checked the website to see if Brown had requested review of her evaluation but found nothing there from Brown. There is no indication in the record whether Brown received a response from the MDE.

### Brown's OSHA and MIOSHA Complaints and Other Events Near the End of the 2015-2016 School Year

On or about May 31, 2016, Brown filed an online discrimination/retaliation complaint against Respondent with the federal Occupational Safety and Health Administration (OSHA) alleging that she was being involuntary transferred and had received a negative performance evaluation because of complaints she made to Cook at the May 26, 2016, meeting. In her OSHA complaint, Brown wrote:

> On May 26, 2016, I met with Principal Cook . . . about safety, health, fraud, stealing issues that DFT members had brought to my attention. I told the Principal that she was ignoring students' and teachers' health with students not being able to receive water or get water as needed. Water in the students/teacher bathrooms' sink which we were told to use to wash our hands was now yellow water.

---

[11] The MDE does not have the authority to grant or hear appeals. See "Educator Evaluations Frequently Asked Questions," supra at 15.

14

In a more detailed statement Brown later submitted to OSHA, she also alleged that a June 7, 2016, email from Branson, discussed more fully below, was retaliatory.

Around this time, according to Brown, she also filed a complaint with the Michigan Occupational Safety and Health Administration (MIOSHA) about lack of an adequate water supply at J.R. King. According to Brown, as a result of this complaint, Respondent was directed by MIOSHA to put some sort of filter system in place so employees could get drinking water, to provide a room where teachers could pick up water for their students directly, and to post a notice at J.R. King stating those things when school began for the 2016-2017 school year. According to Brown, Cook did not post the notice. Although both the OSHA retaliation complaint filed in May 2016 and a complaint Brown filed with MIOSHA on September 20, 2016, were entered into evidence, no documents were offered pertaining to a MIOSHA complaint filed in the spring or summer of 2016. However, Respondent did not contradict Brown's claim that a complaint was filed with MIOSHA complaining about the lack of an adequate supply of drinking water at J.R. King in late May or early June, 2016.

The school's annual field day was held outside on June 3, 2016. During the event, students complained to teachers that there was not enough water. Lakina Mosely, who teaches physical education at J.R. King, and Brown discussed the water situation at the event and agreed that there had not been enough water available. Brown then complained to Cook about the inadequate supply of water for the field day.

On June 5, Cook sent an email to teachers setting out the schedule for the rest of the school year and thanking those who participated in the field day. Cook's email also chastised staff who consistently complained about others and "finger pointed," urging them to stop focusing on others and instead focus on their work. Cook's memo concluded, "Complaining is one of those useless things, just visualize the extra problems it brings. It is like an off pitch vocalist that can't sing. It is heard, but no one is really listening."

On or about June 6, Brown spoke to the school cook, a Ms. Patton, to ask for water for her classroom. Patton told Brown that there was no more water and that she, Patton, "wasn't the water captain." Brown sent an email to Cook relating her conversation with Patton. Mosely confirmed that around this time the school ran entirely out of drinking water.

On June 7, Brown sent an email to Hobbes which said, "For two days now the students at John R. King have been deprived of water." Brown said that she had informed Cook that there was no water available but that when she spoke up for students she got "backlashed from the administration." About fifteen minutes later, at 9:30 am, Brown received an email from the school account of J.R. King Vice-Principal Ivan Branson. The email read," Your Fired im [sic] tired of you selling chips and snacks to those students when you where [sic] told not to." Branson testified that he did not send this email and did not know who did. However, he said that on that date he had left the computer lab on the second floor of the school at around 9:20 am to handle some other business and closed his email program but did not log off the computer. Branson testified that he discovered this when he went into the lab at 2:30 pm the same day, after hearing about the email, and found that he was still logged in.

15

Therefore, according to Branson, anyone else could have come into the lab and sent an email from his account. According to Branson, as soon as he learned of the email he told Brown that he had not sent the email and apologized for it.

After receiving the June 7 email from Branson's account, Brown emailed Hobbs stating that right after she emailed Hobbs about the lack of water she received an email from administration stating that she was fired. Brown asked Hobbs what she should do. At some point, Brown was told by someone in Respondent's administration that no one at J.R. King had the authority to fire her.

I find that as an experienced administrator, Branson would have known that he lacked authority to terminate Brown's employment and that sending her an email that she was fired would have no effect. Moreover, the spelling and punctuation in the June 7 email point toward it being authored by a student, rather than a teacher or administrator. I credit Branson's testimony that he did not author the June 7 email sent through his account.

Around June 7, Booker contacted the DFT and told officials there that there was no water for students at J.R. King. The DFT then obtained a donation of 16 ounce water bottles from the United Auto Workers Union in quantities sufficient to supply the school through the rest of the school year and through summer school. This water was delivered to the school sometime between June 7 and June 17. Cook testified that she did not know about this water delivery.

<u>Events During the Summer of 2016</u>

At some time during or shortly before the summer of 2016, a group of teachers and other individuals began efforts to publicize the problems with drinking water at Respondent's schools that had come to light as a result of the water quality tests. These efforts included passing out flyers outside Respondent's buildings, including J.R. King. A flyer produced by some of these individuals, calling themselves By Any Means Necessary (BAMN), was admitted into the record in this case and is attached to this decision as Appendix A. As the flyer indicates, lack of adequate supplies of drinking water in schools where the drinking fountains had been shut off due to contaminated water was one of the concerns raised by BAMN. Brown did not pass out flyers at J.R. King, and there is no indication in the record that Brown was associated with this group at any time during the events that form the basis of this charge.

Carl Shazor is an ex-J.R. King parent and long-time volunteer at the school. A retiree, he regularly acts as a volunteer hall monitor when school is in session.  On June 22, 2016, Shazor came up to the classroom where Brown was teaching summer school and asked her about a flyer distributed by the BAMN group. According to Brown, Shazor walked into her classroom with a flyer in his hand and said, "Mrs. Brown, what is this about?" Shazor then came close to her and waived the flyer in her face. At that point, Brown left her students and went into the hallway and Shazor followed her. According to Brown, Shazor told her that there were some people outside, and he demanded that she tell him who the people were and why they were at the school. According to Brown, she told him that there was no one outside at that time, although flyers had been distributed at J.R. King the week before. Brown testified that she asked Shazor where he got the flyer, and Shazor testified that he got the flyer from Cook.

16

Brown then told Shazor not to ask her about the flyer, but to ask the people who were distributing it. Brown testified that Shazor told her that he was going to send the flyer to Respondent's central administrative offices. He also said, according to Brown, that she was feeding people lies, and that he was going to make sure that she got fired.

Shazor testified that individuals were passing out a flyer in front of J.R. King on June 22, and that he picked up the flyer from a table in the hall where somebody had left it. Shazor testified that the flyer admitted into the record was not the flyer that he took to show Brown, and that the flyer he obtained had Brown's name on it. According to Shazor, he went to the door of Brown's room and asked if he could speak to her for a second. When Brown came out into the hallway, Shazor said, "Ms. Brown, they are protesting outside and I see your name on the flyer. Could you tell me something about it?" Brown replied, "Don't ask me, go ask them." Shazor then left and went back downstairs. Shazor denied that he raised his voice, stood particularly close to Brown, accused her of "feeding people lies," or said that he would get her fired. Shazor also testified that Cook did not send him to talk to Brown, and that he did not speak to either Cook or Branson about the flyer before or after he tried to talk to Brown.

After Shazor left, Brown sent an email to Branson reporting the incident. Brown also sent an email to Hobbs. Later that day, Brown moved her students to an empty classroom so Shazor could not find her. Sometime later, Branson stopped Brown in the hallway and told her that he would tell Shazor not to come anywhere near her. Brown did not receive a response from Hobbs. Shortly thereafter, Brown stopped teaching summer school.

I find it unnecessary to determine which witness's testimony regarding this incident was accurate. Shazor is not a Respondent supervisor or administrator, and statements made by him cannot therefore be attributed to Respondent. Even if Shazor received the flyer from Cook, as Brown claims he admitted, there is no evidence that Cook asked him to talk to Brown about it. Moreover, whether or not Branson followed up on his promise to Brown to tell Shazor to stay away from her, there is no indication that Shazor did or said anything else of a threatening nature to Brown after this incident.

On or about July 1, 2016, J.R. King was transferred to Network Two, for which Leenet Campbell-Williams was the network leader. On July 21, 2016, Cook sent Campbell-Williams and Lauri Washington an email complaining about Brown. This email is not in the record, and there was no testimony about what it said. However, according to Campbell-Williams, the email spurred her to set up a meeting with Cook. Campbell-Williams' testimony about this meeting was as follows:

When I met with her, she talked about this teacher, Ms. Brown, that she had been having difficulties with. She had started write-ups around 2014-2015, sending write-ups to employee relations, human resources, around the concerns she was having with the teacher. Those concerns included an altercation that the teacher had with another teacher on the floor. The --- really inciting teachers at the building to – what I understood from the principal was that the teacher was causing disruption among the other staff members. That the environment had become very toxic. And the principal, Ms. Cook, had been trying to discipline the

teacher. And she had sent write-ups, but she had not gotten a response from human resources. Normally, you would have at least a corrective discipline process that would happen. And she had been sending information, can I get support with this teacher? I'm having some concerns. [12]

According to Campbell-Williams, she and Cook discussed Brown's conflict with Jackson, which Cook said had caused Jackson to go out on leave and leave a classroom without a teacher, which had caused problems with parents.  Campbell-Williams then asked Cook why nothing had been done "at the labor relations level" about discipline. Campbell-Williams testified that Cook said that Brown's relationship with her colleagues had created a "hostile work environment," and that Cook felt that she was not able to properly mete out discipline. However, Campbell-Williams also testified:

> I understood it to be creating a hostile work environment, primarily, as the concern.  I was aware that the teacher also felt like the principal was responsible for what was happening with the water in the schools, so I was aware of that. At that time, Ms. Cook was sharing with me all of the emails that were going up around just the concerns concerning that. . . Ms. Cook was concerned that the perception was that she was responsible for the problems with the water. [13]

Campbell-Williams testified that Cook then asked for a transfer to another school because she felt that "the situation has gotten really out of control," and that Brown had attacked "her character and professionalism." Cook told Campbell-Williams that Brown was undermining her authority at the school, and that Cook said that she could not run her school effectively in that environment. Campbell-Williams told Cook that she could not transfer her because she was the principal, but that Campbell-Williams would work on getting Brown transferred instead.

Campbell-Williams explained at the hearing that since J.R. King was a "priority school," Campbell-Williams felt it was essential for Cook to be able to do her job in a healthy work environment.  Campbell-Williams also testified that during that meeting, or soon thereafter, she learned that Brown had filed an OSHA complaint and that Cook was the subject. However, she did not know that the complaint was that Cook was retaliating against Brown. According to Campbell-Williams, she did not understand why Brown would file an OSHA complaint against Cook because Cook had no responsibility for the water situation at J.R. King.

Sometime during the summer of 2016, Cook made teacher assignments for the 2016-2017 school year. Cook decided to reassign Brown from sixth to fourth grade. According to Cook, she believed that Brown and Jackson would again be unable to work together in the sixth grade when Jackson returned to work in the fall.

---

[12] Cook also testified that she had sent a series of "write-ups' for Brown to human resources but got no response. However, Lauri Washington from the labor relations division, recalled receiving only two complaints from Cook about Brown. The first complaint was that Brown had been rude to other staff in a professional development meeting and the second involved the August 31, 2016, incident discussed below.

[13] In her own testimony, Cook referred to Brown's "accusations," and described them this way:

> An attack on my character, like I said, as far as dealing with the whole environment of the school, saying that I'm, you know, not pretty much doing what I need to do as a leader.

18

After making this decision, Cook began the process of finding another teacher to teach middle school science. Cook succeeded, and when the 2016-2017 school year began, there were four teachers assigned to sixth grade: Booker, Jackson, McCallum, and a teacher who had previously taught eighth grade science. A new teacher was hired to teach the vacant eighth grade science position.

On August 2, 2016, Campbell-Williams sent an email to Lauri Washington, with copies to Human Resources Representative Valerie Hampton and Cook. This email stated that Campbell-Williams was moving forward with Brown's involuntary transfer and that Hampton had found a placement for her. Washington responded that Campbell-Williams should discuss the matter with Respondent's legal counsel. Between August 2 and September 22, 2016, when Brown was notified of her transfer, a series of emails passed among Campbell-Williams, Lauri Washington, Hampton, and Cassandra Washington about a transfer for Brown. Campbell-Williams continued to press for Brown's transfer, and renewed her efforts after the late August meeting described below.

<u>Meeting on August 30 or 31, 2016</u>

August 30 and August 31, 2016, were teacher workdays scheduled before the beginning of classes. Professional development was held on those dates and some time was also allotted for teachers to prepare their classrooms. On August 30, Vice Principal Branson posted the class schedule he had prepared which included the teachers' preparation periods. Branson assigned Dowlen an extra preparation period because he believed that building representatives were entitled to extra preps and he thought Dowlen was the building representative. Brown came to Branson's office and told him that he had made an error in the schedule because she was now the building representative. Branson said that he would fix the mistake.

Branson knew that at one time union building representatives were allowed an extra preparation period. However, he had not been responsible for preparing the schedule for the 2015-2016 school year, and was unsure if building representatives were still entitled to an extra preparation period. After his conversation with Brown, Branson decided to consult Dowlen, who had been the building representative for the 2015-2016 school year, and Charles Beattie, who had been the building representative the year before Dowlen.

On August 30 or August 31, Branson approached Beattie and Dowlen in the hall and asked about the extra preparation period, explaining that Brown had come to him and said that she should have the extra prep because she was the building representative. Beattie and Dowlen said that they did not think the extra prep period requirement was still in effect. Dowlen told Branson that he would call DFT offices to check. According to Dowlen, he did make the call and was told that an extra prep for building representatives was no longer required. [14]

_____

[14] DFT President Ivy Bailey testified that the requirement that building representatives be given an extra preparation period had been eliminated several years before by order of Respondent's then-emergency financial manager. The new collective bargaining agreement reached by the DFT and Respondent in 2016 did not require that building representatives be given an extra preparation period.

19

Beattie and Dowlen went to Branson's office to give him the information about the extra prep period. Beattie, Dowlen, and Branson all testified at the hearing about what then occurred, as did Brown and Booker. In addition, after the meeting described below took place, Cook asked Beattie, Dowlen and Branson to prepare written statements, and these statements were also admitted into the record.

Branson testified that after Dowlen and Beattie came into his office, they began complaining to him about the building representative election the previous spring. In his written statement, Branson said that they told him that at least 20 teachers had not voted, that many teachers did not receive ballots, and that some teachers were not aware that an election had taken place. According to Branson's statement, they also told Branson that one person had conducted the election which made it invalid because it was supposed to be conducted by a committee. While Dowlen and Beattie were still in his office, Branson called Brown and asked her to come to the office. Brown requested that Booker be present, and Branson called Booker as well.

Branson, Beattie, Dowlen, Brown and Booker all had a different version of what took place after Booker and Brown arrived. According to Brown, when she came into the room Branson began questioning her about the election for building representative and the procedures for voting. Branson wanted to know how Brown became the building representative and wanted to see the nomination forms and the ballots. Booker said she had a copy of the nomination form, but Branson said that Brown had to get the official form. Brown recalled there being some discussion at the meeting of whether a building representative was entitled to an extra prep period. However, she did not recall the content of that discussion except that Dowlen admitted that he had received an extra prep period the previous year.

Booker testified that she arrived at Branson's office before Brown, and that Branson said that he had a few questions to ask her. He then asked her who was the building representative and if she had any "documentation for it." Booker said that Brown was the representative, and that all the documentation had been turned in to the DFT office. According to Booker, Branson also asked Booker when the election had taken place and if she had any proof that Brown was actually the building representative. Booker testified that she was still answering these questions when Brown came in the room. According to Booker, Dowlen then said that he had not gotten an extra prep period when he was building representative even though, according to Booker, he did have an extra prep period the previous year. After Dowlen made this statement, Brown said that he was on the schedule this year as having an extra prep as the building representative, but he was not the representative. Dowlen said that he knew that he was not the building representative but that he did not know who the building representative was. According to Booker, at this point Branson asked Booker if she could get the nomination forms or proof that Brown was the building representative, and she told him to call Barbara Downing at the DFT office. Branson replied that he needed the information but that he was not going call the DFT office. According to to Booker, Brown and Dowlen then began arguing about which one of them would go to get proof that Brown was the building representative.

According to both Dowlen and Beattie, the discussion at the meeting was mostly about whether the building representative was entitled to an additional preparation period.

20

Beattie testified that Brown insisted that both Beattie and Dowlen had received additional preps when they were building representatives. Both denied getting an extra prep period. According to Beattie, it also came out in the discussion that Branson was not aware that Dowlen was no longer the building representative.  Beattie did not recall any discussion of the union election in Branson's office after Booker and Brown arrived, and Dowlen testified that if there was any such discussion, Branson did not participate. Both Beattie and Dowlen denied that Branson asked Brown questions about how she became the building representative, or demanded that she provide proof that she was the representative. Dowlen testified that he himself asked Booker to provide proof that the election had taken place, although it was not clear from his testimony whether this took place while they were in Branson's office.

Branson testified that when Brown arrived at his office, she began to argue with Dowlen and Beattie about whether the election for building representative was conducted properly. In his written statement, Branson said that Brown told him that not getting an additional preparation period "was an effort to prevent her from being a union rep at the school because she works with Steve Conn."[15]  In addition, according to Branson, Brown accused Cook of retaliating against her by moving her from the sixth to the fourth grade. In his statement, Branson said that he told Brown that since he was not a DFT member, he had no say in the DFT election process and that was why he was consulting Beattie and Dowlen.

All five participants in the meeting agree that voices were raised while Brown, Dowlen, Beattie, and Booker were in Branson's office. At some point, this attracted Cook's attention. According to Branson, Cook first simply looked in and made a hand gesture to Branson to quiet down. About ten minutes later, Cook came into the office and said that the meeting was not being conducted in a professional manner. She may also have said it needed to stop. Cook then said that she was leaving, but did not immediately leave the room. After a few minutes, Booker began talking again. All the witnesses agree that Brown then turned to speak to Cook.  There is no substantive difference in the witness' testimony about what Brown said.. According to both Booker and Brown, Brown said, "I thought you said you were gone," Cook responded, "Excuse me?" and Brown replied, "I thought you said you were gone. Goodbye." Cook testified that Brown's second remark was "I thought you were leaving . . . get out."  Although the record is unclear, it appears Cook left the room after Brown's second remark but that the others continued talking for about ten minutes. After the meeting ended, Brown left the building to go to the DFT offices. She obtained a copy of the original nomination forms and ballots and brought them back to show Branson.

With regard to what took place at the meeting before Cook came in, I find Booker's testimony to be the most credible, and Dowlen's and Beatty's accounts to be the least credible. As noted above, Dowlen's body language while on the witness stand was palpably hostile, and Beatty's demeanor was similar to that of Dowlen.  I credit Branson's testimony that after Brown came to him about the extra prep period, he began to wonder whether building representatives were even entitled to an extra prep, and decided to ask Dowlen and Beatty. I also credit his testimony that after they told him that the extra prep requirement had been eliminated, they began complaining to him about the election for building representative.

---

[15] Steve Conn is a teacher employed by Respondent and a long-time union activist. Conn has in the past been associated with BAMN. See *Detroit Pub Schs*, 22 MPER 89 (2009) and *Detroit Pub Schs*, 30 MPER 2 (2016)

21

However, I credit Booker's testimony that when Booker and Brown entered the meeting, Branson asked her who the building representative was and if she had any documentation for it. I also credit Booker's testimony that after she told Branson that Brown was the representative, he began questioning her about the union election. After that, there was discussion, or argument, about whether Dowlen had received an extra prep period as building representative the previous year, after which Branson asked Booker to get nomination forms or proof that Brown was the building representative.   I do not credit Branson's testimony, or Dowlen's or Beattie's, that Branson did not participate in the discussion about whether the Brown had been elected building representative in a union election and whether this election has been conducted properly. I do not find it credible that Vice-Principal Branson would simply have stood by while, as he testified, Brown engaged in a loud argument with Dowlen and Beattie in Branson's office about the union election and/or whether building representatives were entitled to an extra preparation period. Since there is no evidence that Branson told the teachers to leave his office, or even to quiet down, I credit Booker's testimony that Branson asked her if she had documentation for who the building representative was, questioned her about the election, and then asked her to get the "nomination forms or other proof" that Brown was the building representative.

<u>Brown's Written Warning and Discussions About Her Transfer</u>

Later on the morning of August 31, Cook wrote the following email to Campbell-Williams, with copies to Lauri Washington and Respondent's legal counsel:

> Given the situation between the teacher (Katrina Brown) with the Retaliatory/OSHA suit, it is becoming increasing worse working in this environment. She has attacked my character and now she has disrespected me in front of staff members. I have worked diligently and waited patiently for answers and the outcome was to keep documenting and endure the harassment. As a leader, I cannot effectively work to assist my teachers while this teacher continues to undermine the work at this school.
>
> Why would anyone have to work in conditions like this? What is my right as an employee?

Another email conversation involving multiple people followed, with Campbell-Williams pleading to Lauri Washington:

> Can we please move on this one? I worked with Ms. Hamilton to place her at Thirkell before the recommendation to keep her at JR King. It is very toxic right now and I would like to "pull the trigger" on this one. With your consent, I will reach out to Ms. Hampton to send a new assignment letter to Ms. Brown.

As stated above, after the meeting with Branson, Brown visited the DFT offices, obtained a document affirming that she was the building representative, and delivered it to Branson. DFT president Bailey testified that she heard from the DFT membership secretary that there were issues at J.R. King regarding the election of the building representative. As a result, Bailey went to J.R. King to meet with Cook.

Cook told Bailey that teachers had come to her with concerns about the election. Bailey told Cook that Brown was the building representative. She also told Cook that if any teacher had concerns about the election they should call the DFT office, and that Cook should not be asking any questions or having any conversations with teachers about union business. Cook said she understood. Bailey then asked Cook to please let Branson know as well that he could not be involved in union business.

Cook asked Branson, Beattie and Dowlen to write statements about what had occurred at the August 31 meeting, but did not ask Brown or Booker to do the same. Cook later gave Brown a written warning, dated August 31, 2016, for "unprofessional conduct/insubordination" based on Brown's final remark to Cook at the August 31 meeting. The memo cited a written Respondent policy prohibiting "verbal or physical conduct that has the purpose or effect of creating an intimidating, hostile or offensive working environment." For reasons not explained in the record, this written warning was never placed in Brown's personnel file.

<u>Drinking Fountains Are Turned On, and Then Off</u>

When the 2016-2017 school year began, the drinking fountains at J.R. King were still turned off. The building engineer at J.R. King, Emanual El-Amin, works for an outside contractor. He testified that on or about September 9, he received a phone call from his supervisor instructing him to turn the fountains back on. El-Amin was also instructed to run the water in each fountain and sink in the building each Monday morning and prepare a "flush log" documenting that he had done so. According to El-Amin, he reopened the fountains and prepared his first flush log on September 12, 2016. After the fountains were turned on, Brown asked El-Amin if the water was now safe to drink, and he told her that it was.

Meanwhile, emails discussing a transfer for Brown continued to circulate among Respondent administrators. On September 9, Campbell-Williams sent an email to Lauri Washington, Cassandra Washington, and Baker asking for an update on Brown's transfer. The email stated, "This is the teacher involved in principal intimidation and creating a hostile work environment." On September 15, Lauri Washington sent an email to Campbell-Williams, Cassandra Washington, and Baker stating that she had met with Cook and had "information regarding the ongoing issues at the building." Later that day, Campbell-Williams emailed Lauri Washington, with copies to Baker and Cassandra Washington, that she had spoken again with Cook that day and that "the situation continues to escalate." Campbell-Williams also asked again if a decision had been made to transfer Brown to another location.

According to Brown, around September 15 or 16, she telephoned the Detroit Health Department and said the drinking fountains at J.R. King had been turned back on. Brown testified that the health department official to whom she spoke told her that the water should not have been turned back on at the school. Brown passed along the information to Cook and to other teachers in the school, some of whom decided to tell their students not to drink from the fountains. Brown testified that she also called the MDEQ, spoke to a Lois Graham, and was told that the MDEQ would get in touch with Cook. Sometime between September 16 and September 19, 2016, El-Amin received an order from his supervisor to turn the fountains off again.

23

On September 19, 2016, Cook called an emergency staff meeting to inform the teachers that the drinking fountains would remain off until further notice. Cook gave the teachers copies of a letter to J.R. King parents from Felicia Venable, Respondent's acting director of operations and the administrator directing efforts to correct the water issues. Cook told the teachers to hand copies out to their students. A representative from Respondent's engineering department attended the meeting to explain the letter, and Respondent's plans to install a corrosion control system at the school.

According to Brown, Cook also told the teachers at that meeting that if they had any future concerns about the water, they were to discuss them with her and not with other Respondent administrators or outside agencies. Brown testified that Cook said that the proper course was to go through her and "you do not call downtown, you do not call the health department, you do not call the EPA, that there's certain chains of command that you must go through." Lakina Mosely, a physical education teacher who was also present, testified that Cook said that if the teachers wanted to find out anything about the water, to go to her first and not go over her head or go outside to learn anything. According to Mosely, Cook said that if the teachers had questions or concerns about the water, they should bring them to her and she would find out the answers. Mosely also testified that Cook said that she was "getting phone calls from people downtown in regards to the water." A third J.R. King teacher, Nyla Moore, testified that along with the anti-corrosion system, Cook also "spoke about the protocol which we needed to follow if we were going to report things." A fourth teacher, Marvin McCallum, testified that Cook did not say anything about Brown, but that Brown made repeated statements about the water until another teacher spoke up and asked her to be quiet so that they could get through the meeting. Cook denied that she or anyone else said anything at that meeting about Brown's complaints about the water, but she did not deny telling teachers to bring their concerns about the water to her, or telling them not to talk directly to outside agencies or individuals outside the school.

McCallum was one of the teachers involved in an altercation with Brown in the school gym in May 2016. Brown testified that Cook's "chain of command" statement provoked McCallum to remark, "Snitches get stiches," and that other teachers laughed. Brown believed that McCallum's remark was directed at her. McCallum denied making this remark, but Mosely and Moore supported Brown's testimony. Brown testified that McCallum later apologized to her for the remark.

I credit the testimony of Mosely and Brown, supported in part by Moore and not explicitly denied by Cook, that Cook told teachers at the September 19 staff meeting to bring their concerns about the water to her, and not to outside agencies or individuals outside the school. I also credit the testimony of Brown, Mosely, and Moore that McCallum made the "Snitches get stiches," remark.

Venable's letter to J.R. King parents stated that screening for copper and lead at all Respondent's 94 schools had been completed over the summer, and that Respondent's schools had been divided into three groups based on whether they had zero, one, or multiple fixtures exceeding the limits for copper and/or lead under MDEQ guidelines.

24

Venable's letter stated that in the 13 schools with one fixture exceeding the guidelines, that fixture would be disabled or removed and a weekly flush plan for all water fixtures at these schools would be implemented. It said that the installation of corrosion control systems was being considered for the 10 schools, including J.R. King, with multiple fixtures exceeding the limits, and that until a new system was in place the water would be off at the source and bottled drinking water would be provided. The letter also told J.R. King parents that a corrosion control system would be installed that week at J.R. King and that the drinking fountains would be off and drinking water provided until the problem was fixed. Venable's letter to J.R. King parents did not mention that the water had been turned back on for a period at the beginning of the new school year.

On September 20, Brown sent an email to Cook which stated that "the staff has major concerns over the contaminated water we have been exposed to for 10 days," and that there were staff members with health issues. Brown noted that "the fourth grade students did not receive any letters to take home to parents in reference to our students and staff drinking water which has high levels of copper." She asked Cook: (1) whether Respondent was going to offer testing to students and staff who drank the contaminated water for 10 days; (2) who had authorized the water fountains to be turned on; (3) the level of copper/lead found at J.R. King; (3) whether washing hands in the water was safe for the skin, and (4) why the "administration is mad at the staff about communicating health concerns to the public and not mad/upset that students and staff have been drinking contaminated water for 10 days." Cook responded by sending her another copy of Venable's September 19 letter.

Cook also forwarded Brown's September 20 email to Lauri Washington, who forwarded it to Baker and to Respondent's counsel. The email was also eventually forwarded to Venable. Venable responded to Brown in an email on September 21. Venable told Brown that parents and staff who had concerns should consult their personal health care providers, and that washing hands in the water was safe. She also reiterated Respondent's plans for correcting its water problems as set out in her September 19 parent letter.

On September 20, 2016, Brown filed a complaint with MIOSHA asserting that between August 29, 2016 and September 19, 2016, staff drank the water at the school after being incorrectly told that the water was safe. On September 26, 2016, MIOSHA sent a letter to Felicia Venable notifying her that the complaint had been filed with it on September 20, 2016 alleging safety or health hazards at J.R. King. Respondent was directed to investigate and to provide MIOSHA with a copy of the remediation plan for the school if it had not passed water testing during the past summer, recent water test results, and verification that potable water was being provided to staff at the school.

### Brown Is Transferred

Sometime in the early fall of each school year, Respondent goes through a teacher "leveling" process whereby teachers are transferred from schools where the actual fall enrollment has proved lower than the summer estimate to schools where the actual enrollment is higher than the estimate.

Because of the number of oversized classrooms at the beginning of the 2016-2017 school year, then-Interim Superintendent Alycia Meriweather and DFT President Ivy Bailey agreed that the leveling process should begin earlier than usual. On September 16, 2016, Baker sent a memo to all school principals notifying them that network leaders would begin looking at enrollment data and would be making recommendations to Human Resources by Monday, September 19, 2016, as to which schools should be losing or gaining positions, and the number of positions involved. Based on documents entered into the record, it appears that leveling takes place only between schools in the same network.

The calculation of whether a school has more or fewer students than projected is made by Respondent's finance department. Human Resources reviews the network leaders' recommendations and makes the final decision as to which schools will lose positions and which will gain positions and how many. In the fall of 2016, there were eighteen schools within J.R. King's network. According to the record, nine of these schools lost positions and nine gained them. J.R. King lost three positions.

After the final decision is made as to which schools will lose or gain positions, the principals of the schools losing positions and their network leaders then decide what type of positions they will give up. Campbell-Williams testified that all the positions transferred from one school to another in her network were "homeroom" positions because there are more homeroom/self-contained classroom teachers than any other and because the easiest way to compensate for the loss of a teacher is to combine homerooms. After the leveling, the third, fourth, and fifth grades at J.R. King each had one fewer classroom.

After the decision is made that a school will lose positions, and the school decides what type of positions it will give up, Respondent's policy is to transfer the teacher or teachers in these types of positions with the lowest scores on their most recent performance evaluations. According to Cassandra Washington, Brown was selected for transfer because Brown was among the three homeroom/self-contained classroom teachers at J.R. King with the lowest performance evaluation scores for the prior year. There is no dispute that when the decision was made to transfer Brown, there was at least one class at J.R. King, a third grade, that was assigned to a long-term substitute because the teacher was on maternity leave and due to return in October. However, according to Cassandra Washington, teachers on Family Medical Leave (FMLA), like the third grade teacher, are not considered for involuntary transfer because the FMLA protects that teacher's job for twelve weeks.

On Thursday, September 22, 2016, Brown was given a letter notifying her that she was being transferred to a K-8 school on the other side of the City of Detroit, Ronald Brown Academy, effective the following Monday, September 26. Other teachers being leveled received similar letters. However, the DFT notified Respondent that under the terms of the recent collective bargaining agreement, teachers were to receive at least three days' notice of a transfer to another building, including a full work day to pack and move their belongings. Therefore, on September 23, 2017, Brown was issued an amended transfer notice requiring her to report to her new school on Wednesday, September 28. Having not received the new notice, Brown reported to Ronald Brown on September 26, but was told by the school secretary that she was not supposed to be there.

26

On September 27, Brown came to the offices of the Human Resources Department to speak to Valerie Hampton, whose name was on her transfer letter. Hampton would not meet with her and sent her a message to talk to Cook or Campbell-Williams. After waiting several hours to speak to Human Resources Director Baker, Brown left him an email in which she asked to meet with him about why she was transferred. Later that day, Brown sent Baker several other emails asking if she could be transferred to a school on the other side of the City of Detroit or one that had a later starting time, and asking him to explain why she was being reassigned. Brown did talk briefly with Baker that day; according to Brown, Baker told her that he was new but that he would look into it. Baker also told her that "there were about 30 other teachers that had asked to have a hearing on their evaluations." On September 28, Brown sent Baker a third email, with a copy to Alycia Meriweather, asking him to explain how the leveling process worked.

On September 28, 29, and 30, Brown called in sick to the principal at Ronald Brown, Georgina Tait. On Monday, October 3, Brown reported to work although, according to Tait, she did not appear until forty-five minutes after school had started. Tait and Brown had not met before. Brown and Tait talked briefly on the morning of October 3. According to Tait, Tait told Brown that she was excited to be getting a teacher certified in science, and explained that Brown would be teaching science to a different group of students each period.[16] Tait testified that she told Brown that she (Tait) tried to keep an open line of communication with her teachers and that she supported her teachers. Brown then told Tait that she had a doctor's appointment that afternoon and that the doctor would probably put her on sick leave for two weeks. Tait testified that before Brown arrived on the morning of October 3, Tait received a call from DFT President Bailey asking if Brown had appeared for work, and Tait told Bailey that she had not. Tait testified that except for this conversation with Bailey, Tait had not talked to anyone about Brown before Brown arrived at work on October 3. Tait also testified that the only thing she knew about Brown on October 3 was that Brown held a certification in science, which Tait had learned by looking Brown up on the MDE website. In addition, Tait testified that she did not know that Brown had made any complaints about water or anything else at her previous school.

According to Brown, when she met with Tait, she and Tait went over the school's rules. Brown testified that Tait told her "before you make complaints here, you make sure you get the okay with me." Then, according to Brown, Tait told her that she had been sent to Ronald Brown because Tait was "the disciplinarian," and repeated this statement three times. Brown testified that she replied, "Nobody can discipline me but God." Brown did not return to Ronald Brown after leaving on the afternoon of October 3, 2016, and was eventually placed on a long-term unpaid sick leave.

As indicated above, Brown's testimony was that when she first met Tait on October 3, Tait effectively threatened her with discipline if she made complaints while at Ronald Brown Academy. This was obviously a very significant event, because, if Brown's testimony were credited, it would establish that Brown had established a reputation within Respondent as a "complainer" which would likely follow her wherever she was assigned.

---

[16] Tait explained that although Brown had been sent to her as a homeroom, a/k/a self-contained classroom, teacher, Tait planned to assign her to teach middle school science since Ronald Brown did not have a teacher who was specifically certified to teach science at that time.

27

The lengthy and detailed statement of facts Brown included in her charge did not mention any conversation between her and Tait. For this reason, and because I judge Tait to be a credible witness, I credit Tait's version of her conversation with Brown on October 3.

Discussion and Conclusions of Law:

Section 10(1)(c) of PERA
Alleged Discrimination for Union Activity

The elements of a prima facie case of unlawful discrimination under Section 10(1)(c) of PERA are, in addition to the existence of an adverse employment action: (1) union or other protected activity (2) employer knowledge of that activity (3) anti-union animus or hostility toward the employee's exercise of protected rights and (4) suspicious timing or other evidence that protected activity was a motivating cause of the alleged discriminatory action. *Interurban Transit Partnership,* 31 MPER 10 (2017); *Taylor Sch Dist,* 28 MPER 66 (2015); *Grandvue Medical Care Facility,* 1993 MERC Lab Op 686, 696. If a charging party establishes a prima facie case of unlawful discrimination, the burden shifts to the respondent to provide credible evidence that the same action would have been taken even in the absence of the protected conduct. *MESPA v Evart Pub Schs,* 125 Mich App 71, 74 (1983).

Brown alleges that Respondent violated Section 10(1)(c) of PERA by: (1) on May 27, 2016, giving Brown a minimally effective rating on her year-end performance evaluation and then misplacing or ignoring Brown's attempts to appeal that evaluation: (2) sometime in the summer of 2016, reassigning Brown to teach the fourth grade, allegedly to make it more likely she would be transferred in the "leveling process," if J.R. King lost positions in the fall of 2016; and (3) on September 23, 2016, involuntarily transferring Brown from J.R. King to Ronald Brown Academy.

Adverse Employment Action:

The first element needed to establish a violation of Section 10(1)(a) and (c) is the existence of an adverse employment action. In a recent decision, *Taylor Sch Dist and Taylor Federation of Teachers, AFT Local 1085 v Nancy Rhatigan and Rebecca Metz,* 318 Mich App 617 (2016), the Court addressed the meaning of the term "adverse employment action" in the context of Section 10(1)(c) of PERA by quoting from *Pena v Ingham Co Rd Comm,* 255 Mich App 299, 311–312 (2003):

> In *Wilcox v Minnesota Mining & Mfg. Co,* 235 Mich App 347, 364, 597 NW 2d 250 (1999), we defined an adverse employment action as an employment decision that is "materially adverse in that it is more than [a] 'mere inconvenience or an alteration of job responsibilities'" and that "there must be some objective basis for demonstrating that the change is adverse because a 'plaintiff's subjective impressions as to the desirability of one position over another" [are] not controlling.'"

Although there is no exhaustive list of adverse employment actions, typically it takes the form of an ultimate employment decision, such as "a termination in

28

employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."

The *Taylor* Court also cited *Chen v Wayne State Univ*, 284 Mich App 172, 201 (2009), for the proposition that what constitutes an adverse employment action is to be determined on a case by case basis, and noted that the determination will vary according to the specific circumstances of the case.

In *Wayne State Univ*, 28 MER 17 (2014), the Commission held that the charging party's "less than satisfactory" rating on a written job evaluation did not, by itself, amount to an adverse employment action under Section 10(1)(c). In recent years, however, the Legislature has made statutory changes to increase the number of effective classroom teachers. As noted in the statement of facts, school districts are now required to have an evaluation system that classifies teachers as "highly effective," "effective," "minimally effective," or "ineffective." Statutory changes also substantially increased the impact on an individual teacher of receiving a rating below "effective." For example, the Teachers Tenure Act, MCL 38.93, states:

> If the teacher has received a rating of ineffective or minimally effective on an annual year-end performance evaluation, the school district shall provide the teacher with an individualized development plan developed by appropriate administrative personnel in consultation with the individual teacher. The individualized development plan shall require the teacher to make progress toward individual development goals within a specified time period, not to exceed 180 days.

In addition, the Michigan School Code, MCL 380.1249(1)(d), requires a school district, at a minimum, to use the teacher evaluation to inform decisions regarding all of the following:

> (i) The effectiveness of teachers and school administrators, ensuring that they are given ample opportunities for improvement.

> (ii) Promotion, retention, and development of teachers and school administrators, including providing relevant coaching, instruction support, or professional development.

> (iii) Whether to grant tenure or full certification, or both, to teachers and school administrators using rigorous standards and streamlined, transparent, and fair procedures.

> (iv) Removing ineffective tenured and untenured teachers and school administrators after they have had ample opportunities to improve, and ensuring that these decisions are made using rigorous standards and streamlined, transparent, and fair procedures.

As noted above, the Court of Appeals has emphasized that what constitutes an adverse employment action under Section 10(1) (c) of PERA may vary according to the individual circumstances of the case. The employers of teachers whose employment is covered by the above statutes are required to put teachers rated "minimally effective," on their year-end evaluations on individualized development plans, and to consider their evaluations in making teacher retention decisions. I find, therefore, that Brown's "minimally effective" rating in her 2015-2016 evaluation was objectively an adverse employment action for purposes of Section 10(1)(c) of PERA. Moreover, although Respondent is not required by law to allow teachers rated "minimally effective" or better to appeal their evaluations, Respondent has established a procedure by which all its teachers can seek review of their evaluations. I find that under these circumstances, intentionally thwarting a teacher's attempt to appeal his or her year-end evaluation would also constitute an adverse employment action.

In this case, Brown testified that she loved the students at J.R. King and wished to remain at the school, but did not present evidence that her reassignment to Ronald Brown Academy would have objectively affected her compensation, prestige or job responsibilities. Nor did she provide any evidence that teaching positions at Ronald Brown Academy are generally recognized by Respondent's employees as less desirable than teaching positions at J.R. King. See, e.g., *Wayne Co,* 21 MPER 58 (2008). I find, therefore, that Brown's transfer to Ronald Brown Academy in the fall of 2016 did not constitute an adverse employment action in and of itself. I also find that Brown's reassignment from the sixth to the fourth grade, allegedly to facilitate her transfer, was not an adverse employment action. However, I note that the evidence established that Brown's fall 2016 transfer was a direct result of Brown's "minimally effective" 2015-2016 year-end evaluation. That is, the evidence established that Brown was transferred as part of Respondent's leveling process, but that she would not have been one of the three employees at J.R. King selected for leveling if her evaluation score had not been lower than other "homeroom" teachers.

Concerted Protected Activity:

Section 9 of PERA protects the right of public employees to engage in union activities and other "lawful concerted activities for the purpose of collective negotiation or bargaining or other mutual aid and protection." To be protected by Section 9, employees' activities must be both "concerted," and "for mutual aid and protection." The language of Section 9 is in large part based on similar language in Section 7 of the National Labor Relations Act (NLRA) 29 USC 150 et seq., and the Commission and its ALJs have adopted the test for "concerted activity" formulated by the National Labor Relations Board (NLRB) in *Meyers Industries (Meyers I),* 268 NLRB 493 (1984), revd sub nom *Prill v NLRB,* 755 F 2d 941 (CA DC 1985), cert denied 474 US 948 (1985), on remand *Meyers Industries (Meyers II),* 281 NLRB 882 (1986), aff'd sub nom *Prill v NLRB,* 835 F 2d 1481 (CA DC 1987), cert denied 487 US 1205 (1988). That is, activity is "concerted" if it is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." See *City of Adrian,* 1985 MERC Lab Op 764 (no exceptions) (test is not whether the activity *ought* to be of group concern, but whether it was of group concern). See also *Genesee Township Police Department,* 26 MPER (2012) (no exceptions).

30

In *Meyers II,* the NLRB clarified *Meyers I* to explain that that concerted activity also includes situations where an individual employee brings "truly group complaints to management's attention." *Meyers II,* 281 NLRB at 887.

The NLRB finds an employee's activity concerted when he or she acts formally or informally on behalf of the group. *Oakes Machine Corp.,* 288 NLRB 456 (1988). It has also found an individual employee's complaint to a federal agency to be concerted if it is a "logical outgrowth of the concerns of the group." *Every Woman's Place,* 282 NLRB 413 (1986); *Mike Yurosek & Son, Inc,* 306 NLRB 1037, 1038 (1992), after remand, 310 NLRB 831 (1993), enf'd 53 F3d 261 (CA 9 1995). In *Salisbury Hotel,* 283 NLRB 685, 687 (1987), an employee's phone call to the U.S. Department of Labor was held to be concerted activity, even though the employee decided on her own to make the call, because it followed a discussion among employees and individual complaints made by other employees to their supervisors. The NLRB concluded that her call logically grew out of the employees' concerted efforts and was therefore a "continuation" of that concerted activity. It held, therefore, that her discharge for making the call was an unfair labor practice.

I find that Brown engaged in concerted protected activity, as defined above, in the spring and summer of 2016. In March or April 2016, Brown and Booker met with Cook to complain about her "educational malpractice" email, and to discuss other concerns. Whether or not Brown met with Cook in the capacity of an alternate building representative, Booker's participation in the meeting was sufficient to establish this meeting as concerted activity protected by the Act.

On May 23, 2016, after hearing from other teachers that they believed the supply of drinking water for their students was inadequate, Brown raised the issue with Cook and asked that more water be supplied. Insofar as the record discloses, this was the first time Brown brought this issue to the attention of Cook or any other Respondent administrator. I find that Brown's May 23, 2016, request was both concerted and protected. First, according to her unrefuted testimony, Brown spoke to other teachers who shared her concern about the adequacy of the water supplied before raising the issue with Cook. Even if Brown did not lodge her complaint in the form of a grievance, the complaint about the amount of water being supplied to students was a group concern. I also find that in making complaints about the amount of water available to their students, the employees were engaged in acts of "mutual aid and protection." The record indicates that the teachers at J.R. King, unlike the students, were allowed to bring their own drinking water to school. However, lack of sufficient water could affect students' attention spans and behaviors in the classroom. I find, therefore, that the amount of water supplied to their students constituted a term or condition of employment for the teachers at J.R. King. Whether Brown's complaint on behalf of other teachers had merit, i.e., whether the supply of water was truly inadequate, is not relevant to the question of whether her activity was protected.

For the same reasons, I find that Brown's complaints to Hobbs and Cook in early June 2016 that the school had run out of water was protected activity, and that the complaint she filed with MIOSHA in May or June 2016 over lack of adequate water at J.R. King was also protected as it was a logical continuation of prior complaints expressing a group concern.

31

There is no evidence that Brown discussed the fact that the water fountains were turned back on in September 2016 with any other employee before she called the Detroit Health Department or the MDEQ. However, I find that these calls, and Brown's September 20, 2016, email to Cook, were protected activities because they arose from ongoing teacher concerns about the quality of the water at Respondent's schools.

However, I find that Brown's May 31, 2016, OSHA "Whistleblower" complaint was not concerted protected activity. The subject of this complaint was Respondent's alleged retaliation against Brown because of the fact that she had earlier complained, on behalf of other employees, about the water at J.R. King and other issues. Although obviously related to these earlier actions, the OSHA complaint was made solely on her own behalf. While Brown had a legal right to file this complaint, I find that it is not the type of activity PERA was intended to protect.

Knowledge:

The evidence indicates that Respondent was aware of Brown's protected concerted activities as outlined above. I find that even if Brown's May or June MIOSHA complaint did not identify her as the complainant, Respondent would have assumed that Brown filed this complaint based on her previous complaints, and the fact that the water situation at J.R. King was the subject of the complaint.

Anti-Union Animus or Hostility toward Employee's Exercise of Protected Rights:

Inferences of animus and discriminatory motive may be drawn from direct evidence or circumstantial evidence, including the pretextual nature of the reasons offered for the alleged discriminatory actions. *Interurban Transit Partnership,* 31 PER 10 (2017); *Detroit Public Schs,* 30 MPER 2 (2016), *Wayne Co,* 21 MPER 58 (2008).  See also *Volair Contractors, Inc,* 341 NLRB No. 98 (2004); *Tubular Corp of America,* 337 NLRB 99 (2001*); Fluor Daniel, Inc,* 304 NLRB 970 (1991).

It is clear from the record that by mid-summer 2016, Cook was desperate to have Brown transferred to another school. She had also persuaded her supervisor Campbell-Williams to advocate for this action on Cook's behalf with administrators who could approve an involuntary transfer.  I find that Cook hoped for Brown's transfer even before the 2015-2016 school year ended. As indicated above, I find that Cook called McClure in May 2016 and told her that Brown wanted to transfer to another school, even though Brown had not requested a transfer.

There is no evidence that Cook said anything to Brown or any other teacher to indicate Cook's hostility toward Brown was based in any way on Brown's union or other concerted protected activities.  I conclude, however, that Cook's own testimony at the hearing, and the testimony of Campbell-Williams about what Cook told her when they met in July 2016, is sufficient to establish Cook's animus toward these activities.  Campbell-Williams testified that Cook told her about Brown's difficulties in getting along with certain other staff members, and the problems that had caused. However, Cook also told Campbell-Williams that she felt that Brown was unfairly blaming her for the problems with the water and that Brown had "attacked her character and was undermining her position at the school." Cook herself testified that she

32

saw Brown's "accusations" as an attack on her character and on her abilities. By the time Cook first talked to Campbell-Williams, Brown had filed a complaint with OSHA that Cook had retaliated against her for making complaints about various issues, including the supply of water at J.R. King. However, the testimony of both Cook and Campbell-Williams indicates that Cook was not referring to the accusations in the retaliation complaint but to Brown's complaints to Cook about inadequate drinking water which Cook saw as a personal attack.

Animus as the Cause of the Adverse Employment Actions:

As discussed above, I have concluded that Brown's "minimally effective" rating on her 2015-2016 year end evaluation constituted an adverse employment action for purposes of Section 10(1)(a) and (c) of PERA. I have also found that Cook's hostility toward Brown was based, at least in part, on Brown's concerted protected activities. I now must analyze whether Brown met her burden of establishing that Cook's animus toward Brown's protected activity was at least one of the reasons Brown received a "minimally effective" rating and, if so, whether Respondent produced evidence establishing that Brown would have received the same rating in the absence of protected activity.

As set out in the fact section above, I credit Cook's testimony, backed up by that of school secretary Jordan, that Brown did not show Cook her binder for the 2015-2016 school year. Both Jordan and Cook testified that Cook's reaction, when told by Jordan that Brown had said she did not need to meet with Cook again, was to ask Jordan to write a statement to that effect and sign it. I find Cook's reaction rather odd. That is, rather than instructing Jordan to call Brown again and tell her that she had to set up an appointment, Cook sought documentation of what Brown had said about not needing to meet. Cook may have seen Brown's statement to Jordan as an opportunity to justify giving Brown a poor evaluation. However, I find it equally plausible that Cook was simply exasperated by Brown's irrational efforts to avoid discussing her binder.

In its brief, Respondent points out that the numeric score Cook gave Brown on her evaluation was not Brown's final score. Moreover, final evaluation scores are compiled not by Human Resources, but by Respondent's Office of Research, Evaluation and Assessment. Respondent's point, I take it, is that the persons responsible for Brown's final evaluation score had no knowledge of Brown's concerted protected activities. However, it is clear from the letter Brown received from Human Resources on July 29, 2016 that Brown received the maximum possible points on the portions of her evaluation for which the Office of Research, Evaluation and Assessment was responsible. Brown received a final score that put her in the minimally effective category because of the scores Cook gave her on the performance portion of the evaluation. Moreover, although there was testimony that final performance evaluation scores are not shared with principals, I do not take this to mean that Cook did not know that Brown would receive a minimally effective rating after Cook completed her portion of Brown's evaluation. I do not find it credible that, even in a large school, a principal would not know which of his or her teachers would receive a minimally effective or ineffective rating based on the score the principal had given the teacher and that teacher's attendance and/or disciplinary problems.

33

However, there appears to be no dispute that at J.R. King it is obligatory for teachers to keep binders containing evidence of their efforts and accomplishments during the year, and that this evidence is critical in establishing their effectiveness. The explanation Cook provided for the low score she gave Brown on her evaluation was that Brown did not provide Cook with enough evidence of what she had done during the school year to warrant a higher score. Given the credible testimony, this seems incontrovertible. That is, without Brown's binder or any written observation reports, and given that the MAP scores did not show that the sixth graders had shown progress in science, Cook had no way to document that Brown was an effective teacher. I conclude, therefore, that since Brown did not show Cook her binder, Cook would have given Brown the same, or a lower rating, had Brown not engaged in protected concerted activity in the months before the evaluation. I also conclude that Cook did not evaluate Brown unfairly at the end of the 2015-2016 school year, and that Brown's minimally effective rating on that evaluation did not constitute discrimination against her in violation of Section 10(1)(a) and (c) of PERA.

Respondent has a procedure by which teachers who have not been rated "ineffective" may seek internal review of their evaluations. As I held above, given that Respondent has a procedure in place, intentionally thwarting a teacher's attempt to seek review of his or her "minimally effective" evaluation would constitute an adverse employment action. However, Respondent's procedure requires teachers to record comments or ask questions about their evaluations on a Respondent website, and a link to this website is contained in the letter teachers receive notifying them of their final evaluation score. According to testimony, teachers who appeal their evaluations by letter to the Human Resources Department are referred to the website. Although Brown made several attempts to appeal her evaluation by email, and left a handwritten note for Human Resources Director Baker at the Human Resources Department offices on December 7, 2016, there is no indication that Brown went to the website mentioned in her notification letter or sent a letter to the Human Resources Department. Since Brown did not attempt to appeal her evaluation by either of the two means allowed by Respondent, I find that the record does not support a finding that Respondent intentionally thwarted Brown's attempts to appeal her 2015-2016 evaluation.

Section 10(1)(a) of PERA
Coercion and Interference with the Exercise of Section 9 Rights

Brown also alleges that Respondent committed independent violations of Section 10(1)(a) by the following: (1) in May 2016, refusing to investigate Brown's complaints about the conduct of several eighth grade teachers toward her at a school basketball game; (2) in late May 2016, seeking to transfer Brown to another school; (3) on June 7, 2016, sending Brown an email telling her she was fired; (4) in June 2016, sending school volunteer, Carl Shazor, to Brown's classroom to question her, in an intimidating fashion, about a leaflet that had been passed out outside the school; (5) on August 31, 2016, issuing a written warning to Brown for a remark she made to Cook while Brown was being questioned about whether she was the properly elected building representative; (6) announcing, at a staff meeting held on September 19, 2016, that teachers were to raise any concerns they had about the water with Cook and not with anyone else in Respondent's administration or with outside agencies; (7) failing to take action against another teacher who remarked, after Cook's announcement, "Snitches get stiches."

34

The existence of an adverse employment action is not necessary to establish an independent violation of Section 10(1)(a). Statements and other conduct that coerce or interfere with employees' exercise of their Section 9 rights may constitute independent violations of Section 10(1)(a). Proof of anti-union animus is also not required to prove a violation of Section 10(1)(a). *Keego Harbor,* 28 MPER 24 (2014). It is the chilling effect of a threat, and not its subjective intent, that violates PERA. *Michigan State Univ,* 26 MPER 36 (2012) (no exceptions). The test for determining whether Section 10(1)(a) has been violated is whether a reasonable employee would interpret a statement, or other conduct, as an express or implied threat. *Grandvue Medical Care Facility,* 27 MPER 37 (2013); *City of Greenville*, 2001 MERC Lab Op 55, 58. That is, the Commission uses an objective standard to evaluate the coercive effect of employer statements and conduct. *Rochester Sch Dist,* 2000 MERC Lab Op 38; *Greenville,* at 58; *Williams A VanNorman, d/b/a Sight and Sound TV,* 1976 MERC Lab Op 739,743.

In my findings of fact, I credited Branson's testimony that he was not responsible for the June 7, 2016, email sent from his account which told Brown she was fired. I found that even if Shazor received the flyer from Cook, as Brown claims he admitted, there was no evidence that Cook sent him to talk to Brown about the flyer. Moreover, as I noted, because Shazor is not a Respondent supervisor or administrator, statements made by him could not be attributed to Respondent. I find, for the reasons stated above, that the allegations involving the June 7, 2016, email and Shazor's alleged attempts to intimidate Brown in June 2016 should be dismissed.

Both Brown and McCallum, one of the other teachers involved in the incident in the gym on May 25, 2016, complained to Cook about the other's conduct, but Cook apparently did not take any action to determine who might have been at fault. From the testimony of witnesses at the hearing, this was potentially a serious incident involving profanity and the use of force and/or threats to use force by teachers in front of a gathering of students. However, although both Brown and McCallum testified as to their own versions of what occurred on that date, the record does not indicate what either told Cook about the incident. Brown asserts that after this incident she feared for her safety, particularly from Dowlen. She also points out that shortly before this incident Cook listened to far less serious complaints by McConnell and Samuels and chastised Brown in a memo without even giving Brown a chance to respond. According to Brown, Cook's failure to investigate the incident in the gym violated Section 10(1)(a) because it communicated that Cook would not protect her from further assaults by staff members. The test to be applied here is whether a reasonable person would have interpreted Cook's inaction in this situation as a threat to retaliate against Brown for engaging in protected activity. In this case, Brown did not describe any previous conduct by other employees that might have reasonably led Brown, or Cook, to believe that she might be assaulted in the future by members of the J.R. King staff. Moreover, there is nothing that links Cook's failure to respond to either Brown's or McCallum's complaints in this instance with Brown's protected activity. I conclude that a reasonable person would not have interpreted Cook's failure to investigate one specific incident as a threat to retaliate against Brown by allowing her to be assaulted by other staff members.

Brown also alleges that Cook's failure to take action against McCallum for his "snitches get stiches" remark on September 19, 2016, violated Section 10(1)(a). Brown asserts that she felt threatened by McCallum's remark. She also maintains that, as with her failure to investigate the incident in the gym, Cook's failure to take any action in response to McCallum's remark constituted an implicit threat to retaliate against Brown for her protected activities by refusing to

35

protect her from future assaults. McCallum may have had Brown in mind when he said, "snitches get stiches" in the middle of a staff meeting.  However, his remark, while possibly rude, was not a threat of physical assault in the context in which it was made; I note that the alleged threat evoked laughter from others in the meeting. Whether or not Cook should have reprimanded McCallum for making this comment in a meeting, I conclude that a reasonable person in Brown's situation would not have interpreted Cook's inaction as a threat to retaliate against Brown by allowing her to be assaulted by other staff members in the future.

As set out in the findings of fact, I credit Brown's testimony that she did not ask for a transfer to another school in the spring of 2016, and I also credit McClure's testimony that Cook told McClure that Brown had asked to be transferred.  Of course, Brown learned in her first phone call with McClure that she would not be transferred without her consent. However, I find that under the circumstances here, including the fact that Brown was first told by Cook that McClure would be calling her about a transfer, Brown could have reasonably interpreted McClure's call as a threat by Cook to take future adverse action against her if Brown did not voluntarily leave J.R. King. I conclude, therefore, that Cook violated Section 10(1)(a) by causing McClure to call Brown on May 26, 2016, to offer her a transfer.[17]

Brown's fourth Section 10(1)(a) allegation involves the written warning she received for the remarks she made to Cook during her meeting with Branson, Dowlen, Beatty and Booker on or August 31, 2016.  Cook entered the meeting after it had gone on for some time, and for the purpose of telling the participants that they were too loud, but lingered for a brief period after saying so. Brown testified that she said to Cook, "I thought you said you were gone," Cook responded, "Excuse me?" and Brown replied, "I thought you said you were gone. Goodbye." Cook's version differed only in that testified that Brown's second remark was, "I thought you were leaving . . . get out."  As I noted in my findings of fact, I find no significant difference between Brown's and Cook's versions of their exchange. Brown did not threaten or attempt physical violence against Cook. However, she did effectively order Cook to leave the room. Brown's statement was disrespectful toward her supervisor, something that a supervisor would not be expected to tolerate in a normal workplace interaction.

The Commission has long recognized that in the course of collective bargaining and grievance discussions, administration, tempers may become heated and harsh words may be exchanged, and that the protections for this conduct would be illusory if employees were held to the same standards of conduct in these contexts as when dealing with their supervisors in the general workplace. *Interurban Transit Partnership,* 31 MPER 10 (2017). The Commission has held that discipline for offensive conduct occurring in this context should be permitted only in the most extreme cases. *City of Detroit (Water & Sewerage Dep't),* 1988 MERC Lab Op 1039, 1046. Rude or insulting remarks, obstreperous comments, and other forms of rough language, are protected under PERA when made in the course of protected concerted activity.

---

[17] The involuntary transfer of a teacher is a prohibited subject of bargaining under Section 15(3)(j) of PERA. *Pontiac Sch Dist,* 27 MPER 52 (2014), aff'd in an unpublished decision on September 15, 2015, Docket No.321221. Pursuant to Section 15(4), therefore, teacher transfer is "within the sole authority of a public school employer to decide." As I have found above, however, under the circumstances of this case Respondent's offer to allow Brown to transfer voluntarily carried an implied threat of future adverse employment action.

For example, in *Isabella County Sheriff*, 1978 MERC Lab Op 168 (no exceptions), a Commission ALJ, citing *Bettcher Mfg Corp*, 76 NLRB 526 (1948), concluded that a sheriff's deputy was engaged in concerted protected activity when he participated, along with several other deputies, in a meeting between the sheriff and a union steward to discuss a proposed new work schedule. The ALJ also found that the deputy did not lose the protection of the PERA by screaming at the sheriff and pointing his finger at him, or by calling the sheriff lazy, the undersheriff stupid, and the sergeant a drunk. Even a reference to an act of physical violence in this context does not, by itself, remove an employee from the Act's protection. *Unionville-Sebewaing Area Schs*, 1981 MERC Lab Op 932, 935. In *Baldwin Cmty Schs*, 1986 MERC Lab Op 513, the Commission held that an employee did not lose the protection of the Act by angrily accusing his principal of being a homosexual, and waiving a pencil in the principal's face, in a meeting called to discuss his grievances. It noted:

> Although grievance meetings may sometimes result in heated exchanges, frank discussion in this setting may reduce the likelihood that the dispute will spill over into the workplace. For this reason, a disciplinary remedy should be applied to conduct occurring during the course of such a meeting only in the most extreme cases.

An employee engaged in otherwise protected activity may lawfully be disciplined under PERA only when his or her behavior is so flagrant or extreme as to render that individual unfit for future service. *Isabella County Sheriff's Dep't* at 174; *Unionville-Sebewaing Area Sch*, at 934. The question of whether conduct should be protected under the Act may depend on whether the incident takes place "on the shop floor" in the presence of other employees or the public, or in a grievance meeting or collective bargaining session. Spontaneous remarks may be protected, whereas a history of similar intimidation or insubordination by the employee militates against finding the conduct protected. *Baldwin Comm Sch* at 520; *Univ of Mich*, 2000 MERC Lab Op 192, 195 (no exceptions). Also relevant is whether the employee was merely responding to heated remarks or insults by the employer. *Baldwin Comm Sch.*

The meeting on August 30 or August 31, 2016 was neither a collective bargaining session nor a formal grievance meeting. However, the protection for concerted activity extends even to informal discussions of grievances or terms or conditions of employment. In this case, Brown was called to a meeting by a supervisor, Branson, in his office. In addition to a discussion over whether building representatives were entitled to an extra prep period, the meeting involved a heated dispute over whether Brown had been elected union building representative in a properly conducted union election. As I found above, Branson participated in this argument by asking Booker who the building representative was, questioning her about the election, and then asking her to get the nomination forms from the election or other proof that Brown was the building representative. As discussed in the section below, this meeting should never have taken place, as Respondent did not have the right to involve itself in whether the union election was legitimate or whether Brown was the duly elected representative, and Brown and her fellow teacher and DFT executive board member Booker should not have been forced into defending the election to Branson. I conclude the discussion in Branson's office was analogous to a grievance discussion, and that the participation of Brown and Booker in this discussion constituted activity protected by the Act.

I also note that the discussion of whether Brown had been properly elected, as well as Brown's clearly disrespectful remarks to Cook, took place within the confines of Branson's office and that the only employees present were those invited there by Branson.

Cook herself did not participate in the discussion of the election, and there is no evidence that Cook knew what topics were being discussed when she entered the meeting. However, the statement Branson later gave Cook indicated that these topics included the conduct of the union election the previous spring as well as whether Brown was entitled to an extra preparation period. Although Cook did not herself participate in discussing these topics with Brown, I find that Brown's remarks to Cook were an extension of the discussion, and therefore entitled to protection. Since I find that Brown's remarks were not so extreme as to render her unfit for future service, I conclude that Brown could not lawfully be disciplined for these remarks. As noted above, for reasons not explained in the record, Brown's August 31 written warning appears not to have been placed in her personnel file as discipline. However, Brown was given the written warning and never informed that it had been rescinded. I conclude that Cook violated Section 10(1)(a) by issuing this written warning.

Brown's fifth allegation is that Cook interfered with the exercise of her or other employees' Section 9 rights by telling teachers, at the September 19 staff meeting, that teachers should follow protocol by bringing any questions they had about the water to her first and should not contact outside agencies or others about the water. Since Brown had contacted the Detroit Department of Health and the MDEQ only three or four days earlier, and the water fountains at J.R. King were shut off after her calls, it seems likely that Brown's telephone calls prompted Cook's statement about proper protocols. However, I conclude that whatever prompted Cook's statement, her directive to teachers that they not contact individuals outside the school or outside agencies about the water at J.R. King unlawfully interfered with the teachers' exercise of their right, under Section 9 of PERA. It is clear that an employer cannot lawfully prohibit a group of employees from filing a joint complaint with an outside agency about their working conditions, or from taking other concerted actions, such as speaking to the press, to bring their mutual concerns to the attention of the public. I find that by telling J.R. King teachers that they would violate protocol by contacting outside agencies or individuals about the water at J.R. King, Cook implicitly threatened to discipline them if they did so. This threat, I conclude, violated Section 10(1)(a) of PERA.

Section 10(1)(b) of PERA
Interference with the Administration of a Labor Organization

Section 10(1)(b) of PERA makes it unlawful for a public employer to "initiate, create, dominate, contribute to, or interfere with the formation or administration of any labor organization." Brown alleges that Respondent interfered with the administration of the DFT by convening a meeting on August 30 or August 31, 2016, with past building representatives to investigate whether Brown had been properly elected as the building representative for the 2016-2017 school year and whether she was entitled to an extra preparation period. She also alleges that Respondent violated Section 10(1)(b) by requiring Brown to prove at that meeting that an election had occurred.

38

Finally, Brown alleges that Cook and/or Branson interfered with the administration of the DFT by questioning teachers at J.R. King about whether they had voted in an election for building representative the previous spring.

As to the third allegation, Cook testified that teachers came to her with concerns about the building representative election. Branson, Dowlen and Beattie all testified that Dowlen and Beattie raised the issue of whether a proper election had been conducted with Branson. There is no evidence that either Cook or Branson approached any teachers to ask them whether they had voted in the union election the previous spring.

Branson clearly had the right to seek confirmation that building representatives were still entitled to an extra preparation period before taking the extra prep off Dowlen's schedule and giving it to Brown. There was also nothing inherently improper about asking two former building representatives if the extra prep requirement was still in effect. However, after listening to Beattie and Dowlen complain about the union election, it must have been clear to Branson that there was a dispute among the union members in his building about how, and if, Brown had been elected building representative. At this point, Branson could have called the DFT office, or had someone in administration check on his behalf, to confirm that the Brown was the DFT's designated representative. He might also have simply accepted Booker and Brown's statement that Brown was the building representative, and left it to the union members who felt that the election had been conducted improperly to lodge an internal complaint. I find that Branson knowingly interjected himself into the internal affairs of the DFT when he questioned Booker and Brown about the way the election had been conducted and asked them to provide "nomination forms or other proof" that Brown was the building representative. I also find that this conduct constituted unlawful interference with the administration of a labor organization, and therefore violated Section 10(1)(b) of PERA.

## Remedy

I have found in this case that Cook unlawfully threatened to take adverse employment action against Brown if she did not agree to transfer schools in May 2016, and unlawfully disciplined or attempted to discipline Brown for remarks Brown made in the course of protected activity on August 30 or August 31, 2016 in violation of Section 10(1)(a) of PERA. I have, in addition, found that Cook unlawfully threatened Brown and other J.R. King teachers with discipline on September 19, 2016, if they complained to individuals outside the school or outside agencies about their drinking water. I have also found that Branson violated Section 10(1)(b) of PERA when he questioned Booker and Brown about the way the DFT building representative election had been conducted and asked them to provide "nomination forms or other proof" that Brown was the building representative.

When the Commission determines that an unfair labor practice has been committed, Section 16(b) of PERA provides that the Commission is to issue an order requiring the respondent to cease and desist from the unfair labor practice and, "to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the purposes of the Act."

39

When an employer is found guilty of violating Section 10(1)(c) of PERA, the relief typically ordered is "make-whole," i.e. a remedy which, to the extent possible, places the employee in the same position he or she would have been had the unfair labor practice not been committed.

In the instant case, Brown left work and went on an extended unpaid medical leave in October 2016 after she was transferred to Ronald Brown Academy. Brown asserts that Respondent's actions made it untenable for her to continue to work and that had she done so her health would have been seriously affected. Drawing an analogy with a constructive discharge, Brown argues that Respondent's actions amounted to a constructive suspension and that the appropriate relief includes making Brown whole for the wages and other benefits she lost as a result of Respondent's unfair labor practices.

The term "constructive discharge" is applied to situations where employees resign their employment after the employer has deliberately made their working conditions so intolerable that the employees cannot continue their work, thus converting what appears on its face to be a voluntary termination to an involuntary one. In order to establish a constructive discharge, the employee must show: (1) that the employer caused or intended to cause changes in working conditions so unpleasant or difficult that a reasonable person would be forced to resign and (2) that these changes leading up to the discharge were caused by the employee's protected activity. *City of Detroit,* 18 MPER 58 (2005); *Louisiana Homes, Inc,* 1994 MERC Lab Op 1064, citing *LeGalley* v *Bronson Community Schools,* 127 Mich App 482 (1983). As the *LeGalley* Court stated, at 487, "A constructive discharge involves the employer's deliberate effort to make things difficult for an employee, thus forcing him or her to resign . . . Before a constructive discharge may be found, the trier of fact must be satisfied that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." [internal citations omitted].

To find that Brown was constructively suspended under the test for constructive discharge, I must find that Respondent deliberately made Brown's working conditions so difficult or unpleasant that a reasonable person in Brown's shoes would have felt compelled to take unpaid sick leave (in lieu of resigning) to protect his or her health. Brown argues that she had been targeted and that she feared further discipline if she continued to work. In the instant case, I have found that Cook unlawfully threatened to take adverse employment action against Brown if she did not agree to transfer schools in May 2016, and unlawfully disciplined or attempted to discipline Brown for remarks Brown made in the course of protected activity on August 30 or August 31, 2016. I have, in addition found that Cook unlawfully threatened Brown and other J.R. King teachers with discipline on September 19, 2016, if they complained to individuals outside the school or outside agencies about their drinking water. However, the unfair labor practices I have found in this case were committed by either Cook or Vice-Principal Branson. I have not found any other Respondent agent to have committed an unfair labor practice. Nor have I found credible evidence that Respondent's other supervisors or administrators shared Cook's animus toward Brown's protected activities. Respondent is a large organization, and at the time Brown ceased working she was no longer under Cook's authority because she had been transferred to another school.

40

I am unable to conclude on the facts of this case that Brown's working conditions were so intolerable that a reasonable person would have been forced to take unpaid sick leave rather than continue to work. I conclude, therefore, that a remedy that includes backpay is not appropriate in this case.

As noted above, I found that Respondent violated Section 10(1)(a) of PERA by giving Brown the written warning dated August 31, 2016, for the remarks she made to Cook during Brown's meeting with Branson, Booker, Dowlen and Beattie. The normal remedy for a violation of this type would be, in addition to a cease and desist order, an order to remove the written warning from Brown's personnel or disciplinary file. However, since the written warning was apparently not placed in her file, and it is unclear whether Respondent ever intended to put it there, I recommend that the Commission order Respondent to either remove the written warning from Brown's file or refrain from placing it there.

Based upon the findings of fact and conclusions of law set out above, I find that Respondent violated Section 10(1)(a), (b) and (c) of PERA, and I recommend that the Commission issue the following remedial order.

## RECOMMENDED ORDER

Respondent Detroit Public Schools Community District, its officers and agents, are hereby ordered to:

Cease and desist from:

1. Interfering with, restraining or coercing employees in the exercise of their rights to organize together or to form, join, or assist in a labor organization; engage in lawful concerted activities for the purpose of collective negotiation or bargaining or other mutual aid and protection; negotiate or bargain collectively with their public employers through representatives of their own free choice, or refrain from any or all of these activities, as guaranteed by Section 9 of PERA by:

   a. On or about May 26, 2016, offering teacher Katrina Brown, a teacher at J.R. King Elementary/Middle School, a transfer to another school under circumstances that implied that she would be subject to future adverse employment actions as a result of her activities protected by Section 9 if she did not accept the transfer.

   b. On or about August 31, 2016, giving Katrina Brown, a teacher at J.R. King Academy, a written warning for engaging in conduct protected by Section 9 of PERA.

41

   c.  On or about September 19, 2016, threatening teachers at J.R. King with discipline if they spoke to outside agencies or individuals outside the school regarding their concerns about the quality of the water at that school.

2.  Interfering with the administration of a labor organization by, on or about August 31, 2016, questioning Brown and fellow J.R. King teacher Glenda Booker about the way the election for DFT building representative had been conducted the previous spring and asking them to provide Respondent with "nomination forms or other proof" that Brown had been elected building representative at J. R. King for the 2016-2017 school year.

Take the following affirmative action to effectuate the purposes of the Act:

1.  Rescind the written warning issued to Brown on or about August 31, 2016 and remove it from Brown's personnel and/or disciplinary file if it has been placed there.

2.  Post the attached notice to employees at places on Respondent's premises where notices to employees are customarily posted, for a period of thirty (30) consecutive days.

MICHIGAN EMPLOYMENT RELATIONS COMMISSION

Julia C. Stern
Administrative Law Judge
Michigan Administrative Hearing System

Dated: November 16, 2017

# STOP Governor Snyder and his new Emergency Manager Rhodes from POISONING DETROIT'S CHILDREN

Lead and copper poisoning flows through the plumbing of Detroit schools. The contaminants cause permanent brain damage, kidney problems, retardation of physical growth, and are toxic to every organ in the human body. Children are especially vulnerable to the effects. Medical science has found no cure.

The recent discovery of this public health crisis—revealed during the ongoing scandal of lead poisoning in the Flint water supply—now marks the most appalling chapter of the state takeover of Detroit. Ever since the state took away the democratic rights of the people of Detroit, the state takeover has closed more than 100 schools, purged over 100,000 students from the district, created a blight of abandoned buildings and neighborhoods, and did all of this under the pretense of resolving a debt that the takeover has only made worse. Now, lead poisoning threatens the developing minds of Detroit's children, and yet Governor Snyder's takeover regime still only concerns itself to *avoid spending any money* and to *avoid taking any responsibility*.

No child in Detroit is safe while Governor Snyder commands the city with unchecked, dictatorial power. Detroit faces the most critical civil rights struggle in its history—a struggle for the lives and wellbeing of Detroit's children.

**End all "Emergency Manager" regimes. Stop the destruction of our community.**

The water contamination crises in Detroit and Flint are the result of an extraordinary abuse of power, and that same abuse is now preventing any effective emergency response. The Snyder administration suspended democracy in numerous Michigan cities (Detroit, Flint, Pontiac, Benton Harbor, Highland Park), assuming dictatorial control through a previously-obscure "Emergency Manager" law, and proceeded to decimate the schools and the public health conditions in Michigan's predominantly black, Latino, and poor communities. The immediate aim of these measures was to cut spending on public education and social services, diverting the money towards charter school companies and other private contractors, instead. The results became national scandals. The EAA "Snyder schools" have consistently ranked among the very worst in the country, and made headlines last year when various EAA authorities were indicted on charges of corruption. The entire Flint water supply has become a poison delivery system, as lead contamination spread throughout the city—Snyder's administration refused to warn the public or even acknowledge the problem until higher authorities intervened.

And now Detroit is facing its own lead contamination crisis, as well.

The escalating numbers of takeover-related catastrophes were not accidents—they were the direct result of the policy to slash and redirect funding away from essential services. Likewise, the failure of the takeovers to manage these catastrophes is not accidental, either.

When news of the scandal emerged that Detroit's children have been subjected to lead contamination in the schools, the response of Governor Snyder and Emergency Manager Steven Rhodes was both equally predictable and shameful. Their practical "remedies" were to take only such measures that cost virtually nothing: after turning off the water in the most contaminated schools, the district administration granted the provision of

**WE DEMAND:**

- Test for contamination in ALL schools in Detroit and across Michigan NOW
- Medical screening conducted in the schools for all students
- Find and remove the sources of contamination — fix the problem rather than use it as an excuse to close schools
- Declare a Federal Emergency to make additional funds available
- Emergency Manager Steven Rhodes must go — No more authority for Gov. Snyder to manage dictatorial regimes — End all state takeovers
- Stop the attacks on public education
- Restore democracy in Detroit — End the New Jim Crow

**TAKE ACTION NOW:**

Sign and circulate the petition to "Restore the Democratic Rights of the People of Detroit Now." Contact BAMN for more information.

## PUBLIC TRIBUNAL

**Saturday, June 11 @5pm**
Rincón Tropical Restaurant,
6538 Michigan Ave, Detroit

Join BAMN's class-action lawsuit to win justice against the lead and copper poisoning crisis. If your child has tested positive for lead or copper poisoning, contact BAMN immediately.

**EQUAL OPPORTUNITY NOW / BY ANY MEANS NECESSARY (EON/BAMN)** [2016.04.23]
A Caucus Fighting for Civil Rights and Public Education in the National Education Association and the American Federation of Teachers
Contact (313) 980-7075 or (313) 806-1485 email@bamn.com www.bamn.com Join our EON/BAMN Facebook group

Appendix A

only *three shot-glass-sized containers of clean water* for each student to drink per day. The water contamination test, itself, was funded through an outside grant. No medical screening in the schools, no professional assessments to detect impairments in brain function, and of course no building repairs to remove the contaminants. The public statements of the Snyder regime were similarly empty—they could barely maintain any posture of real concern because the primary objectives of their statements were to make the problems sound minimal and to avert any outburst of public discontent. The "Emergency Manager" was largely preoccupied with downplaying the severity of the emergency and avoiding any expenditures for managing it.

Any decent, responsible leadership would have and should have taken immediate action to remove the contaminants from the schools and to provide a safe and healthy learning environment. However, because the Snyder regime only prioritizes *how to avoid spending money on Detroit's children*, there is the additional danger that the takeover could initiate a *new round of school closings* rather than pay to keep the buildings safely operational. Students not only face the threat of permanent brain damage from lead poisoning, but also the threat of losing their schools, altogether.

Even in the face of a humanitarian crisis, the Snyder takeover regime does not willingly make any exceptions to its destructive agenda. This is the plainest expression of the New Jim Crow, a regime in which the profits of the Governor's business partners take priority over the very lives and wellbeing of every black, Latino, poor and working class child in the state.

*The state takeovers must be abolished, democracy must be restored, and the enemies of public education must never again place their hands upon the students of Detroit.*

## Build the new civil rights movement to restore our democratic rights now.

The accumulation of scandals—lead poisoning, financial mismanagement, and the destruction of education—have combined to weaken the Snyder administration severely. The months of teacher and student sickouts and walkouts put the takeover on its knees and succeeded in driving out the previous Emergency Manager, Darnell Earley. These factors have even created a situation in which the Governor cannot pass any legislation in pursuit of his larger agenda, because the members of his own party are attempting to dissociate themselves from the long list of catastrophes that he has precipitated.

But these facts by themselves are not enough to restore the democratic rights of the people of Detroit. They simply prove that we can.

Tyrants never give up their power without a fight. In 1954, when the Supreme Court ruled in *Brown v. Board of Education* that "separate can never be equal," this was a truly momentous event—but it did not stop any of the Southern segregationists from continuing to impose their Jim Crow laws. To realize the promise of integration and democratic rights for America's black communi-

ties, it was necessary to build a mass civil rights movement. Dr. Martin Luther King, Jr. led that movement on the basis of direct action and community organizing. Only when that movement became powerful enough and bold enough did it then become possible to break the resistance of the old, racist Southern states. The federal government did not and would not have enforced its promises of civil rights without King's struggle.

The movement led by Dr. King *was* the real source and real practice of democracy for millions of black Americans—the formal rights arrived belatedly. After King's death, when the movement began to diminish, the formal rights began to diminish, as well. A democracy "of the people, by the people, and for the people" does not truly exist without the direct, mass assertion of power *by* those people. Democracy can only exist in the Detroit schools insofar as the students, teachers, and community can impose our own will and our own interests against the powers who seek to rule otherwise. No one can give democracy to us—we must create it for ourselves.

The great task of the next period is for the disenfranchised community of Detroit to become the single, commanding power guiding the direction of the city. Not the corporate "reformers" and their predatory vision for a "new" Detroit, not the petty bureaucrats and careerists who are only interested in advancing their own positions, but just *us* fighting together for our community and for the lives of the students who are now in real danger. There has never been a more urgent time to fight.

---

## LEAD POISONING IN THE SCHOOLS: WHAT YOU NEED TO KNOW, AND WHAT CAN BE DONE

**There is no "safe" level of lead.** Even the smallest amounts of lead can cause serious harm (see below). But politicians and the news media are creating a false impression to the contrary, by referring only to "action levels" at which the government is required to remove the contaminants. These are arbitrary, legal standards—not medical standards. If anyone tells you that the amount of lead in a school or in a child's bloodstream is "safe" because it is below a certain threshold, *that is a lie*. The only relevance of those thresholds is that there are levels below which the government has decided to do absolutely nothing—regardless of the health risk.

**Authorities can do much more than they claim.** While there is no cure for the damage caused by lead poisoning, there are medicines that purge lead from the body to prevent further damage. Also, medical screening for lead in the bloodstream is available for free—there is no reason why this cannot be done in the schools.

**It is necessary to replace the old plumbing lines.** Even in brand new buildings, there can be old lead pipes underneath that connect to the city water supply. That is why some of the most toxic schools are actually new. That is also why *school closures solve nothing.* Without replacing the pipes, the problem just continues. Additionally, some contaminated schools have only blocked off the particular water fountains that tested positive. This is a terrible mistake—all the water must be presumed unsafe until the source of the toxins is found and replaced.



**Lead work area**
**Poison!**
**No smoking, eating or drinking allowed**

*"No amount of lead is safe. Eliminating all lead exposure in our environment is our best course of action. … Exposure to lead can have a wide range of effects on a child's development and behavior. Blood lead levels less than 10 micrograms per deciliter (μg/dL) are associated with increased behavioral effects, delayed puberty, and decreases in hearing, cognitive performance, and postnatal growth or height. Some of these health effects are found even at low blood lead levels less than 5 μg/dL, including lower IQ scores, decreased academic achievement, and increases in both behavioral problems and attention-related behaviors."*
—NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES, a part of the U.S. Department of Health and Human Services

Appendix A

## NOTICE TO EMPLOYEES

AFTER A PUBLIC HEARING, THE MICHIGAN EMPLOYMENT RELATIONS COMMISSION HAS FOUND THE **DETROIT PUBLIC SCHOOLS COMMUNITY DISTRICT** TO HAVE COMMITTED UNFAIR LABOR PRACTICES IN VIOLATION OF THE MICHIGAN PUBLIC EMPLOYMENT RELATIONS ACT (PERA). PURSUANT TO THE TERMS OF THE COMMISSION'S ORDER,

### WE HEREBY NOTIFY OUR EMPLOYEES THAT:

**WE WILL NOT** interfere with, restrain or coerce employees in the exercise of their rights to organize together or to form, join, or assist in a labor organization; engage in lawful concerted activities for the purpose of collective negotiation or bargaining or other mutual aid and protection; negotiate or bargain collectively with their public employers through representatives of their own free choice, or refrain from any or all of these activities, as guaranteed by Section 9 of PERA by:

On or about May 26, 2016, offering teacher Katrina Brown, a teacher at J.R. King Elementary/Middle School, a transfer to another school under circumstances that implied that she would be subject to future adverse employment actions as a result of her activities protected by Section 9 if she did not accept the transfer.

On or about August 31, 2016, giving Katrina Brown, a teacher at J.R. King Academy, a written reprimand for engaging in conduct protected by Section 9 of PERA.

On or about September 19, 2016, threatening teachers at J.R. King with discipline if they spoke to outside agencies or individuals outside the school regarding their concerns about the quality of the water at that school.

**WE WILL NOT** interfere with the administration of a labor organization by, on or about August 31, 2016, questioning Brown and fellow J.R. King teacher Glenda Booker about the way the election for DFT building representative had been conducted the previous spring and asking them to provide Respondent with "nomination forms or

other proof" that Brown had been elected building representative at J. R. King for the 2016-2017 school year.

**WE WILL** take the following affirmative action to effectuate the purposes of the Act:

Rescind the written warning issued to Brown on or about August 31, 2016, and remove it from Brown's personnel and/or disciplinary file if it has been placed there.

**DETROIT  PUBLIC  SCHOOLS  COMMUNITY SCHOOL  DISTRICT**

By: _____

Title: _____

Date: _____

Any questions concerning this notice may be directed to the office of the Michigan Employment Relations Commission, Cadillac Place, 3026 W. Grand Blvd, Suite 2-750, P.O. Box 02988, Detroit, Michigan 48202. Telephone: (313) 456-3510.

Case No. C16 J-107